1   David N. Lake, Esq., State Bar No. 180775
2   **LAW OFFICES OF DAVID N. LAKE,**
      **A Professional Corporation**
3   16130 Ventura Boulevard, Suite 650
4   Encino, California 91436
    Telephone: (818) 788-5100
5   Facsimile: (818) 788-5199
6   david@lakelawpc.com

7   Attorneys for Plaintiff

8



FILED
CLERK, U.S. DISTRICT COURT
MAR - 6 2014
CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

9              **UNITED STATES DISTRICT COURT**

10             **CENTRAL DISTRICT OF CALIFORNIA**

11  LOUSIANA MUNICIPAL POLICE        Case No. **CV14 - 1670** GAF (RZx)
12  EMPLOYEES RETIREMENT
    SYSTEM,
13
14              Plaintiff,                **VERIFIED SHAREHOLDERS'**
                                          **DERIVATIVE ACTION**
15       v.
16
17  STEPHEN BERMAN, an individual;       **JURY TRIAL DEMANDED**
    JOEL BENNETT, an individual;
18  MICHAEL G. MILLER, an individual;
19  MURRAY L. SKALA, an individual;
    ROBERT E. GLICK, an individual;
20  MARVIN ELLIN, an individual; DAN
21  ALMAGOR, an individual; LEIGH
    ANNE BRODSKY, an individual; REX
22  H. POULSEN, an individual; and
23  PETER F. REILLY, an individual;

24              Defendants.

25  JAKKS PACIFIC, INC.,
26
                Nominal Defendant.
27

28

                              Complaint

Plaintiff Louisiana Municipal Police Employees Retirement System ("Plaintiff"), by its attorneys, brings this shareholder's derivative complaint against the individual defendants (the "Individual Defendants") named herein.   The allegations are asserted on information and belief after due investigation, except as to those matters which relate to Plaintiff and its own acts, which are asserted on personal knowledge.

## NATURE OF THE ACTION

1.    This is a shareholder's derivative action (the "Action") brought for the benefit of nominal defendant JAKKS Pacific, Inc. ("JAKKS" or the "Company") against certain present and former members of JAKKS' Board of Directors. Plaintiff seeks to recover damages inflicted upon JAKKS by defendants' conduct in connection with: (a) actions taken to entrench the Board and prevent a buy-out of the Company at an advantageous price; (b) joint venture agreements with an influential shareholder which entrench the Board and disadvantage JAKKS; (c) an unreasonable compensation package granted to the CEO which allows the CEO to prosper even if the shareholders do not; (d) inadequate and obfuscatory disclosures in the latest proxy statement regarding questionable transactions; and (e) the costs associated with an alleged securities fraud committed upon public shareholders.

2.    From October 2011 to mid-2012 the Board rejected a buy-out offer of the Company at $20 per share (or possibly more, the "Offer"), from Oaktree Capital Management, L.P. ("Oaktree") claiming that JAKKS business plan would yield higher value to shareholders.  When another activist shareholder the Clinton Group, Inc. (the "Clinton Group") joined Oaktree in its buyout efforts, the Board sought to assuage Clinton Group by agreeing to buy back $80 million worth of JAKKS stock at a price of $20 per share, pursuant to a standstill agreement (the "Standstill Agreement") that blocked Clinton from taking action for approximately one year. JAKKS also agreed with Clinton Group to engage in discussions with Oaktree.

3.     Instead of engaging with Oaktree, the Board used the "breathing room" it had purchased to find a friendly party to buy JAKKS shares, to protect them from further takeover efforts and entrench the Board. This "white knight" materialized in the person of Dr. Patrick Soon-Shiong ("Dr. Soon."). Dr. Soon was a wealthy investor in biotech companies who wished to launch a foray into the toy industry. Dr. Soon was known to be a passive investor who posed no risk to oust the JAKKS Board. By the fall of 2012, Dr. Soon had bought a significant stake in JAKKS shares without investing any money into the cash-strapped Company directly. To solidify Dr. Soon's position as a large investor who would prevent any potential takeover of JAKKS, and thereby entrench the Board, JAKKS entered into two lopsided joint ventures with companies controlled by Dr. Soon. These joint ventures placed the risk of loss from these joint ventures on JAKKS and its shareholders but permitted Dr. Soon to share in any potential profits, but without the risk of loss. By 2013, Dr. Soon had acquired what amounted to a controlling stake in JAKKS's shares. CEO Berman, whose compensation was historically tied to the fortunes of JAKKS, was granted a gift by his entrenched Board: his pay was largely linked in late 2012 to the profits of the joint ventures with Dr. Soon's companies, regardless of whether JAKKS shareholders saw any increase in share value.

4.     Instead of focusing on how to raise funds for JAKKS so it could compete with industry leaders Mattel and Hasbro, JAKKS' Board focused instead of entrenching transactions that led to no increases in JAKKS' share price. By late 2012, just weeks after the close of the $80 million stock repurchase, Company projections were being revised and lowered, and JAKKS' stock price reacted accordingly. By the end of 2012, the stock fell to just $12.50 per share. By 2013, JAKKS shares had fallen as low as $4.45 per share, and presently trade at about $6.00 per share. Its cash position has declined from $257 million at December 31, 2011 *to $51.5 million as of September 30, 2013.*

5.     Despite these reversals, the JAKKS Board extended the employment contract of CEO Berman to December 31, 2018, even though the Company's shares are trading near an all-time low.  The Board modified his employment contract so he can be paid huge bonuses despite the fact that the Company cannot meet EPS earnings goals.  Moreover, much of his compensation is now pegged to the aforementioned "joint venture" with Dr. Soon's company, the full details of which have been concealed from shareholders.  An independent Board would have fired Berman, not entrenched him, and raised his pay.  The employment scheme is tilted toward enabling Berman to do very well even if JAKKS and its shareholders do not.

6.     The Complaint also asserts claims against the JAKKS top executives (Berman and Bennett) arising out of potential liability related to the securities fraud class actions filed in this District and described below (the "Securities Class Actions").  These actions maintain that these executives (the "Securities Class Action Individual Defendants") defrauded purchasers of JAKKS shares by issuing public statements concerning the financial performance of the Company which allegedly were materially false and misleading.

7.     This Court has designated *Melot v. JAKKS, Inc., et al.*, 13 CV 5388 (JAK)(SSx) (C.D. Cal.) as the lead class action.  The "Class Period" asserted is July 17, 2012 through July 17, 2013.

8.     The Class Period in the Securities Class action ends on July 17, 2013, after the market close, when JAKKS slashed its full-year forecast of revenue and earnings, citing poor sales in light of a marked shift in children's playing preference to electronic devices.  The Company said it would suspend its dividend, and implement a restructuring plan involving a "substantial reduction of leased space, employees and other overhead expenses."

9.     On this news, JAKK dropped approximately 39% from a close of $11.48 per share on July 17, 2013, to a close of $7.00 per share on July 18, 2013.

1    The stock price has continued to decline and has mostly traded around the $5 to
2    $6.50 per share range.

3         10.    Plaintiff in the derivative action does not independently assert that any
4    fraud was committed, but rather seek damages from the Individual Defendants for
5    any harm shown in the Securities Class Actions to have been committed by them
6    and paid for by the Company, so that the innocent shareholders are not forced to
7    bear the cost of such wrongful conduct.

8         11.    In sum, the claims asserted herein are brought against the following
9    defendants as follows:

10        (a)    Claims for contribution and damages relating to the Securities Class
11   Action are asserted against defendants Berman and Bennett under both federal law
12   and state law;

13        (b)    Claims for damages relating to the Securities Class Action are asserted
14   against defendants Almagor Berman, Bennett, Ellin, Glick, Miller, Skala and Reilly
15   (as to conduct subsequent to April 21, 2012, when Reilly joined the Board) for state
16   law breach of fiduciary duty;

17        (c)    Claims relating to the description of CEO Berman's compensation
18   scheme and the September 2012 Joint Ventures (as defined below) in the 2013
19   Proxy Statement are brought under federal and state law against all present directors
20   (defendants Berman, Brodsky, Glick, Miller, Poulsen, Reilly and Skala) and former
21   director Ellin.  Such claims are brought directly and derivatively;

22        (d)    Claims for damages arising out of the joint ventures with Dr. Soon's
23   companies (the "September 2012 Joint Ventures") are brought against director
24   defendants Berman, Skala, Glick, Ellin, Miller, Almagor, Reilly and Brodsky for
25   state law breach of fiduciary duty; and

26        (e)    Claims relating to the reasonableness of defendant Berman's new
27   employment agreements made in late 2012 are asserted under state law for breach of

28

1  fiduciary duty against defendants Almagor, Berman, Brodsky, Ellin, Glick, Miller,

2  Reilly and Skala.

3  ## JURISDICTION AND VENUE

4      12.    This Court has jurisdiction over the subject matter of this action

5  pursuant to 28 U.S.C. §§ 1331, 1332 and 1367. The federal claims asserted herein

6  arise under and pursuant to the provisions of the Sections 10(b), 14(a), and 21(D) of

7  the Securities Exchange Act, 15 U.S.C. § 78j(b), 15 U.S.C. § 78n(a), and 15 U.S.C.

8  § 78u(4)(f)(8)(the "Exchange Act"). Plaintiff also asserts supplemental common

9  law claims under 28 U.S.C. § 1367. As to diversity jurisdiction, Plaintiff is a

10  citizen of the State of Louisiana while each defendant is a citizen of a state other

11  than Louisiana.

12      13.    This Court has jurisdiction over this action pursuant to the federal

13  securities laws, 28 U.S.C § 1331, insofar as Plaintiff seeks on behalf of the

14  Company: contribution from the Class Action Individual Defendants for all damages

15  and/or other costs incurred by JAKKS arising from the Securities Class Action. The

16  Securities Class Actions allege violations of Sections 10(b) and 20(a) of the

17  Exchange Act. The Exchange Act (Section 21D, 15 U.S.C. §78u-4) provides for

18  contribution to those injured by joint violators of the federal securities laws.  *See*

19  *also Musick, Peller & Garrett v. Employers Ins. of Wausau,* 508 U.S. 286 (1991)

20  (holding that there is an implied right to contribution under §10(b) of the Exchange

21  Act, now codified at Section 21D(f)), and for violation of section 14 of the

22  Exchange Act and Rule 14a-9 for the dissemination of a materially false and

23  omissive Proxy Statement.

24      14.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b). A

25  number of the claimed wrongful acts and practices asserted herein occurred in this

26  District.

27      15.    In connection with the acts, conduct and other wrongs alleged in this

28  Complaint, defendants, directly or indirectly, used the means and instrumentalities of

interstate commerce, including but not limited to, the United States mail, interstate telephone communications, the Internet and the facilities of the national securities exchange.

## PARTIES

16.    Plaintiff has held JAKKS shares since July 2012, and continues to hold JAKKS shares. Plaintiff is a Louisiana-based retirement system that provides retirement allowances and other benefits to full-time municipal police officers and employees in the State of Louisiana.

17.    Defendant JAKKS is a Delaware corporation with its principal executive offices located at 22619 Pacific Coast Highway, Malibu, California 90265.  Its common stock trades on the NASDAQ under the ticker symbol "JAKK."  JAKKS develops, produces, and markets toys and consumer products in the United States and internationally.  JAKKS is a citizen of California and/or Delaware.

18.    JAKKS operates in two segments, Traditional Toys and Electronics; and Role Play, Novelty and Seasonal Toys. The Company offers action figures and accessories primarily based on Monsuno, Batman, Ultimate Fighting Champion, Total Non-Stop Action wrestling, and Pokémon franchises; Toy vehicles comprising Road Champs, Fly Wheels, and MXS toy vehicles and accessories; and electronics products under the SpyNet spy products, EyeClops Bionic Eye products, Laser Challenge, and Plug It In & Play TV Games based on Disney and other brands. It also offers small, large, fashion, and baby dolls based on Disney Princess, Disney Fairies, Cabbage Patch Kids, Hello Kitty, Graco, and Fisher Price brands; private label products; and pet products, which comprise toys, consumables, and accessories under the JAKKS Pets, Kong, and American Classics brand names.   In addition, the Company offers food play and activity kits under the Creepy Crawlers and BloPens brands; and role play, dress-up, pretend play, and novelty products for boys and girls based on Black & Decker, McDonalds, Dirt Devil, Disney Princess, Disney Fairies, and Dora the Explorer, as well as on its proprietary brands.  Further, it offers indoor

1    and outdoor kids furniture, activity trays and tables, and room décor; kiddie pools

2    and seasonal and outdoor products based on Crayola and Disney characters;

3    Funnoodle pool floats; and Halloween and everyday costumes under the Spiderman,

4    Iron Man, Toy Story, Sesame Street, Power Rangers, Hasbro, and Disney Princess

5    brands, as well as Halloween accessories.

6        19.    Defendant Stephen G. Berman ("Berman") is, and has been, the

7    Company's Chief Executive Officer and President, and a member of the Company's

8    Board of Directors (the "Board") at all relevant times.  He has been the corporate

9    Secretary and a director since he co-founded JAKKS in January 1995.  From January 1,

10    1999 he served as President.  From February 17, 2009 through March 31, 2010 he was

11    also Co-Chief Executive Officer and since April 1, 2010 he has been Chief Executive

12    Officer.  Berman is a citizen of California.

13        20.    Defendant Joel M. Bennett ("Bennett") is, and has been, the Company's

14    Chief Financial Officer and Executive Vice President at all relevant times.  He joined

15    the Company in September 1995 as Chief Financial Officer and was given the

16    additional title of Executive Vice President in May 2000.  Bennett is a citizen of

17    California.

18        21.    Defendant Murray L. Skala ("Skala") has been a director since October

19    1995.  Since 1976, Skala has been a partner in the law firm Feder Kaszovitz LLP

20    (f/k/a Feder, Kaszovitz, Isaacson, Weber, Skala, Bass & Rhine LLP), the Company's

21    general counsel.  Skala is a citizen of New York.

22        22.    Defendant Robert E. Glick ("Glick") has been a director since October

23    1996.  Glick is a citizen of Florida.

24        23.    Defendant Marvin Ellin ("Ellin") was a director from October 2010

25    through December 6, 2013.  Ellin is a citizen of New York.

26        24.    Defendant Michael G. Miller ("Miller") has been a Director since

27    February 1996.  Miller is a citizen of Florida.

28

25. Defendant Dan Almagor ("Almagor") was a director from September 2004 through December 26, 2012. Almagor is a citizen of New Jersey.

26. Defendant Leigh Anne Brodsky ("Brodsky") was a director from May 8, 2012 through December 6, 2013. Brodsky is a citizen of New Jersey.

27. Defendant Peter F. Reilly ("Reilly") has been a JAKKS director since April 21, 2012. Reilly is a citizen of New Jersey.

28. Defendant Rex H. Poulsen ("Poulsen") has been a JAKKS director since December 26, 2012. Poulsen is a citizen of California.

29. Non-employee Directors are very well compensated by JAKKS. In addition to an annual cash stipend of $75,000, payments to committee chairs and the members of the audit committee total $30,000 and $15,000 respectively; payments to the chair of the compensation committee and the nominating and governance committee total $15,000 and each member of such committees receives an annual fee of $10,000. There is also an annual grant of restricted common shares to each Director in the amount of $100,000.

## SUBSTANTIVE ALLEGATIONS

### A.    The Defensive Repurchase

#### 1.    The Board Rejects a Premium Bid and Decides to Effect a Defensive Repurchase

30. What follows are the facts relating to the Board's actions rejecting an offer to acquire the Company. Instead, it engaged in defensive maneuvers. These acts included the aforementioned $80 million stock repurchase (the "Defensive Repurchase"). Plaintiff does not assert any substantive claims as to the Defensive Repurchase, but discusses it herein as important background for the acts that were to follow.

31. On September 13, 2011, Oaktree announced that certain funds and accounts that it managed (the "Oaktree Funds") made a proposal to acquire all outstanding shares of JAKKS common stock for $20.00 per share in cash, representing a total equity value of approximately $670 million on a fully diluted

basis.  The offer represented a 25% premium over the Company's closing stock price as of September 13, 2011, the 30-day average closing price of the Company's stock leading up to September 13, 2011; and the average closing price of the Company's stock over the preceding 24 months.  Oaktree asserted that it made the proposal public after the Board purportedly refused to engage in discussions. The Oaktree Funds were then among JAKKS' largest shareholders, with a collective stake at that time of approximately 4.9% of JAKKS common shares.

32.    On October 5, 2011, the Board rejected the Offer.

33.    On March 4, 2012, the Clinton Group, in support of Oaktree's position, publicly urged the JAKKS Board to conduct an auction for the Company.

34.    On March 5, 2012, JAKKS announced that its Board had unanimously adopted a "poison pill" stockholder rights plan and declared a dividend of one right for each outstanding share of the Company's common stock.

35.    On April 17, 2012, Oaktree made public a letter it had sent to the JAKKS Board accusing it of entrenching itself, and opining that management had no realistic plan to maximize shareholder value.

36.    Defendant Berman quickly responded, rejecting Oaktree's position.

37.    Thereafter, the JAKKS Board resolved to negotiate a standstill with the Clinton Group.

38.    On April 23, 2012 the directors revealed that they had decided, as part of an April 21, 2012 Standstill Agreement, to assuage the Clinton Group by repurchasing at least $80 million of JAKKS shares (the "Defensive Repurchase") and increasing the size of the Board.  The share buyback would be worth at least $20 a share, representing a 14% premium to stock prices that reflected the hope that JAKKS would be taken over.  The Company agreed to add two members to its Board, for a total of eight.

39.    In exchange, Clinton Group agreed to certain standstill restrictions until 60 days before the Company's December 2013 annual meeting, and to vote for the

Company's slate of board nominees at the upcoming annual meeting. To fulfill the Standstill Agreement, defendants Brodsky and Reilly joined the Board. In order to fund the Defensive Repurchase JAKKS was required to incur debt of over $53 million. As part of the Standstill Agreement, JAKKS agreed to negotiate with Oaktree. As before, no progress with Oaktree was made.

40.    On June 28, 2012, the Company announced the preliminary results of the Defensive Repurchase. The 4,000,000 shares bought back in the Defensive Repurchase represented approximately 15.4% of the Company's shares outstanding as of May 24, 2012.

41.    The Defensive Repurchase had no positive effect on JAKKS' share price. Rather JAKKS' share price steadily declined thereafter.

42.    The financial results for the quarter ended June 30, 2012 (announced on July 17, 2012) showed a net loss for the first six months of 2012, adjusted for legal fees, was $13.5 million, up from a loss of $5.6 million for the first six months of 2011.

43.    In September 2012, JAKKS revised its earnings downward. On September 28, 2012 the Dow Jones Newswire reported:

> Jakks Pacific Inc. (JAKK) lowered its full-year guidance as the toy maker said it experienced "disappointing" domestic product sales and a slowdown in orders, as well as increased expenses. Shares were down 8.9% at $13.27 in after-hours trading.
>
> The company now expects adjusted earnings of about *68 cents to 74 cents* a share and revenue of $690 million to $700 million. Its prior view called for a profit of *$1.04 to $1.08 a share* and revenue between $720 million and $728 million.
>
> Jakks said it will take a one-time non-cash charge of $3.45 a share for impairment of its domestic deferred tax assets if it doesn't achieve meet at least the top-end of its new earnings projection.

The maker of Pokemon, Monsuno, Winx and Hello Kitty toys in July notched two consecutive quarters of sales growth after 2011's top line slid 9.3%. However, its second-quarter profit slumped 95% on higher legal advisory fees and lower income from a video game joint venture.

Jakks has touted an early favorable response to the launch of Monsuno action figures, the first line the company launched in which it also owns the entertainment content. Monsuno figures are tied to a character-based storyline featured on an animated television show that debuted in February.

The stock is off 24% over the past 12 months.

44.    Investors reacted angrily.    JAKKS had pegged its prospects on the Monsuno line of toys, but these were low-tech gadgets, and were tied to a Nickelodeon show which had met a mediocre reception.    Moreover, Nickelodeon itself was experiencing a steep decline in ratings, a decline that was evident at the time the Standstill Agreement was entered.    On an October 23, 2012 conference call JAKKS convened to discuss its third quarter, Jonathan Fite of KMS Investments summarized his company's grievances:

We have been shareholders of JAKKS for several years now, and given our tenure, just bear with me for a moment.
***
[A]bout 18 months ago, you began touting the wondrous prospects of Monsuno, but these failed to deliver. You've severely missed earnings projections in 2011, and you've lowered expectations again for 2012.

Most recently, you refuse to negotiate in good faith with a firm willing to offer shareholders $20-plus, but instead you decided to spend shareholder money on a tender at the same price. Since that tender took place, you've weakened the balance sheet and presented over a 30% drop in the share price. Yet you've had your compensation contract renewed at pretty substantial levels.

So can you explain to me why you might deserve to have that contract renewed and why you think your capital allocation record over the past three years really deserves to be rewarded?

45. Berman refused to directly address Fite's concerns, to which Fite responded: *"it seems that you have taken an approach of doing things that keep you and your management team in place, earning a really nice salary, but do that at the expense of shareholders…"*

46. On that same call, Berman conceded that Nickelodeon's plummeting popularity had affected Monsuno sales:

[W]e've spent a good amount of marketing dollars and have it on Nick Tunes. *The viewership of Nickelodeon itself or Nick Tunes has dropped last year, as well it's dropped significantly over the last two years, so we're not getting the retention of the boys here.* So it's more working based off of advertising. So while it's extremely growing on a rapid basis all overseas, it's doing well here, but not as to what we expected..."

47. JAKKS shares closed on October 23, 2012 at a price of $12.70 per share, 36.5% below the June 2012 repurchase price.

48. Desperate to derail any further bids for the Company, the Board searched for a friendly investor who would not have an interest in replacing the Board and management.

49. On July 17, 2012 JAKKS announced that Dr. Patrick Soon-Shiong (Dr. Soon"), a wealthy investor, had tentatively agreed to partner with the Company in an interactive toy joint venture. JAKKS announced that the DreamPlay Toys joint venture with Dr. Soon's NantWorks LLC holding company would incorporate NantWorks' proprietary image recognition technology. Dr. Soon had made a fortune in healthcare investments, and was not perceived as a threat to the Board. Thus, the Board welcomed his soon-to-be-announced purchase of a large block of

1  the Company's shares in the open market (which purchase produced no funds for

2  JAKKS).

3      50.    In September 2012, JAKKS concluded two joint venture agreements

4  with companies controlled by Dr. Soon.  On October 15, 2012, it was announced

5  that an investment company controlled by Dr. Soon had taken a roughly 9 percent

6  stake in JAKKS.  As reported, Dr. Soon's California Capital Z LLC, based in Culver

7  City, had first acquired a small stake in JAKKS in August 2012, and then added to

8  its holdings after lopsided joint venture agreements were entered into by JAKKS.

9      51.    As of October 11, 2013, Dr. Soon had increased his stake in JAKKS to

10  24.9%, making a hostile acquisition of JAKKS effectively impossible.  This was

11  done with the acquiescence of the Board.  As noted by Forbes: "Soon's brand of

12  activist investing is different than that of a Carl Icahn or Bill Ackman.  He's not an

13  antagonist activist.  Soon creates value, working with companies, by being a great

14  visionary, innovator and deal maker.  But he has yet to produce value for

15  shareholders, including himself."[1]

16      **1. JAKKS' History of Missing Forecasts**

17      52.    After the July 2012 earnings announcement, which was lackluster, the

18  Board should have focused on improving JAKKS financial condition through an

19  equity investment or perhaps selling to a third party (such as Oaktree or a similar

20  concern) so that it could effectively compete.  While bullish forecasts could be

21  useful to this process, they could not be viewed as "money in the bank."  Indeed,

22  JAKKS had a history of failing to meet its own guidance, reflecting its inability to

23  forecast accurately in this market.  Despite this history, as recounted below, the

24  Board's policy has been entrenchment at all costs, and an inexplicable desire to

25  enrich CEO Berman.

26

27  [1]    *Biotech Billionaire Takes A Beating Toying Around With JAKKS Pacific*, Forbes.com,
     Aug, 30, 2013, available at:  http://www.forbes.com/sites/greatspeculations/2013/08/30/biotech-
28  billionaire-takes-a-beating-toying-around-with-jakks-pacific/

a.    On December 16, 2011, JAKKS was forced to reveal its sales performance was disappointing during the important holiday season, and this had resulted in higher markdown allowances and higher royalty expenses relating to license guarantee shortfalls.  The Company announced anticipated net sales for the full year 2011 of approximately $660 million, with diluted earnings per share in the range of $0.37 to $0.40, excluding non-recurring financial and legal advisory charges.  This was a very substantial reduction from the Company's previously anticipated full year 2011 net sales of approximately $770 million to $775 million, with diluted earnings per share in the range of $1.32 to $1.35, excluding such one-time charges;

b.    On February 21, 2012, JAKKS announced guidance for 2012 including an increase in net sales of 6.2% to 7.4% to approximately $720 million to $728 million, with diluted earnings per share in the range of approximately $1.01 to $1.07, excluding any financial and legal advisory fees.  This guidance anticipated first-quarter 2012 net sales in the range of $63 to $70 million, with a loss per share in the range of $0.61 to $0.64;

c.    The 2012 forecast was heavily reliant on the success of the Monsuno product line which, in turn, was heavily reliant on the success of Nickelodeon, which broadcast the Monsuno animated shows. But, in March 2012, it was revealed that Nick had for the first time ever fallen to second place in ratings to Disney, and that its ratings were in free-fall, dropping 31% year over year.  The directors did not revise projections based on this development.

d.    By September 28, 2012, with Clinton Group neutralized, the directors lowered 2012 guidance as a result of claimed disappointing domestic product sales and a slow-down in product orders, coupled with higher expenses, including marketing and advertising expense commitments and minimum license royalty guarantees. The Company announced that it anticipated net sales for the full year of approximately $690 million to $700 million, with revised non-GAAP

1    earnings per share in the range of approximately $0.68 to $0.74. Berman conceded

2    on the October 2012 conference call that there was a correlation between poor

3    Nickelodeon ratings and Monsuno sales.  His remarks contain a concession that this

4    situation was no surprise to him personally;

5         e.    On February 21, 2013 JAKKS reported results for the

6    Company's fourth quarter and full year ended December 31, 2012.  Net sales for the

7    fourth quarter of 2012 were $133.5 million, compared to $141.1 million reported in

8    the comparable period in 2011.  The reported net loss for the fourth quarter was

9    $119.5 million, or $5.45 per diluted share, which included a one-time non-cash

10   charge of $91.7 million or $4.18 per diluted share, related to the impairment of

11   deferred tax assets, and $0.8 million of pre-tax charges, or $0.03 per diluted share,

12   related to legal and financial advisory fees and expenses associated with the

13   unsolicited indication of interest and activist shareholder activities. Defendant

14   Berman stated, "We are disappointed by our performance in the fourth quarter. The

15   difficult and challenging toy environment did not generate the sales that had been

16   anticipated, and several of our key products did not achieve the sales levels that we

17   had planned for, also resulting in license royalty minimum guarantee shortfalls.

18   However, we are optimistic for our future growth and profitability. We believe that

19   our core business lead by our infant/preschool, seasonal and Halloween segments, in

20   conjunction with meaningful reductions in operating costs, will return the Company

21   to profitability in 2013." Berman continued, "We believe that the difficult

22   environment for toys in 2012 resulted from rapid changes in children's play patterns

23   as tablet and smartphone devices and interactive games and toys have more and

24   more become cornerstones of their play and fun experiences.  We recognize that it is

25   critical for us to provide new, more exciting and magical experiences for today's

26   child compatible with these new play patterns. We believe that our partnership with

27   NantWorks in creating our DreamPlay line of toys using NantWorks proprietary ID

28   recognition technology will place JAKKS in the forefront of the play revolution we

1  are witnessing.   We believe that applying this technology to a broad array of

2  characters and play patterns will create new consumer demand for JAKKS products

3  and will help JAKKS achieve substantial long range growth and profitability,

4  warranting the investment in technology and content that we are making;"

5          f.      At the same time, the Company announced 2013 guidance

6  foreseeing an increase in net sales of 4.0% to 5.0% to approximately $694 million to

7  $700 million, with diluted earnings per share in the range of approximately $0.63 to

8  $0.68.    This guidance anticipated first-quarter 2013 net sales in the range

9  of $70 to $73 million, with a loss per share in the range of $0.83 to $0.85, which

10 reflects 17.6% fewer common shares outstanding primarily as a result of the July

11 2012 Defensive Repurchase;

12         g.      On July 17, 2013, JAKKS announced its second Quarter 2013

13 results. Net sales for the second quarter of 2013 were $106.2 million compared to

14 net sales of $145.4 million reported in the comparable period in 2012.  The reported

15 net loss for the second quarter was $46.9 million, or $2.14 per diluted share, which

16 included charges for license minimum guarantee shortfalls of $14.1 million and

17 inventory impairment of $12.2 million. This compared to net income of $0.2

18 million, or $0.01 per diluted share, reported in the comparable period in 2012, which

19 included $1.7 million, or $0.5 per diluted share, of legal and financial advisory fees

20 and expenses related to the 2011 unsolicited indication of interest.  Net sales for the

21 six months ending June 30, 2013, were $184.3 million compared to $218.8

22 million in 2012.  The net loss reported for the six month period was $74.4 million,

23 or $3.40 per diluted share, which includes $0.8 million, or $0.03 per diluted share,

24 of pre-tax financial and legal advisory fees and expenses relating to the 2011

25 unsolicited indication of interest, and charges for license minimum guarantee

26 shortfalls of $14.4 million and inventory impairment of $14.9 million.  This

27 compared to a net loss for the first six months of 2012 of $15.8 million, or $0.61 per

28 diluted share, which included $3.1 million, or $0.09 per diluted share, of pre-tax

financial and legal advisory fees and expenses. Defendant Berman stated, "We are disappointed that JAKKS has not met its second quarter target and will not achieve its full year 2013 forecast. Sales for the second quarter were significantly below expectations due to a variety of factors. Several retailers, both in the United States and in Europe, are struggling and have substantially decreased their orders. In addition, the poor performance of several of our key properties, including Monsuno and the Winx Club, also contributed to the decline, along with unusually cool weather that affected seasonal toy sales leading to more aggressive markdowns at retail as shelves are cleared for back-to-school products. We also believe the decline in sales reflects the continuing change in play patterns of children of all ages, who continue to rely more and more on smart devices for their fun and entertainment. As previously announced, this shift in play patterns has caused companies like JAKKS to evolve to meet the changing demands of its consumers with technologically enhanced product offerings."   Berman further stated "We are making key, targeted moves to align operations, drive productivity and support innovation with the objective of returning the Company to profitability in 2014. We believe that JAKKS, which has now been in business for almost 18 years, will be able to weather the seismic shift that the toy industry is experiencing due in large part to our commitment to growing a segment of our portfolio that combines the power of digital content with physical product, such as our innovative DreamPlay line of toy products. These initiatives should be seen in this strategic context as we continue to reshape our business to improve innovation and product sales and with it our long-term ability to compete in a rapidly changing industry. Coupled with our core, evergreen business, we expect that JAKKS will be able to solidify its position in 2014 and beyond as one of the leading toy companies in the United States;" and

h.    At the same time as the Second Quarter earnings announcement JAKKS was forced to revise downward its full year 2013 guidance.   It was announced that the Company anticipated net sales for the full year of

approximately $620.0 million, with revised loss per share in the range of approximately $56.1 million, or $2.56 per diluted share. The revised guidance represented a reduction from the Company's previously anticipated full year net sales of approximately $694 million to $700 million and diluted earnings per share in the range of approximately $0.63 to $0.68, excluding financial and legal advisory fees relating to the 2011 unsolicited indication of interest.

**2.    The Board's Interactions With Dr. Soon Breach Their Fiduciary Duties and Serve Entrenchment Goals**

53.    The Board has encouraged Dr. Soon, a "friendly" investor, to acquire what is now a 24.9% controlling and blocking stake in JAKKS' shares.  In exchange, the Board has entered into joint venture agreements which are highly advantageous to Dr. Soon, with the risk of loss entirely on JAKKS but with Dr. Soon sharing in any upside.  The result of entering into these joint ventures and encouraging Dr. Soon to acquire a large stake in JAKKS is to entrench the Board and shield it from being held accountable to JAKKS shareholders for the Company's dismal performance.

54.    With Dr. Soon ensconced in his large position and financially favorable joint venture with JAKKS, the Board need not worry about Clinton Group or Oaktree or similar overtures.  But the relationship with Dr. Soon came with a heavy price to JAKKS. The transactions with Dr. Soon's companies are lopsided in favor of Dr. Soon, and any acquirer will inherit them (thus discouraging acquisition efforts).  These transactions violate the *Unocal* Standard (the Delaware rule which prohibits unreasonable anti-takeover measures) and constitute a breach of the duty of loyalty.  They deter takeovers at an unreasonable cost to JAKKS.

55.    In its latest quarterly filing on Form 10-Q, JAKKS describes the "joint ventures" (the "September 2012 JV Agreements") with Dr. Soon's companies as follows:

In September 2012, the Company entered into a joint venture ("DreamPlay Toys") with NantWorks LLC ("NantWorks") in which it owns a fifty percent interest. Pursuant to the operating agreement of DreamPlay Toys, the Company paid to NantWorks cash in the amount of $8.0 million and issued NantWorks a warrant to purchase 1.5 million shares of the Company's common stock at a value of $7.0 million in exchange for the exclusive right to arrange for the provision of the NantWorks recognition technology platform for toy products. The Company has classified these rights as an intangible asset and will amortize the asset over the anticipated revenue stream from the exploitation of these rights. The joint venture entered into a Toy Services Agreement with an initial term of three years expiring on October 1, 2015 and a renewal period at the option of the Company expiring October 1, 2018, subject to the achievement of certain financial targets, to develop and produce toys utilizing recognition technologies owned by NantWorks. Pursuant to the terms of the Toy Services Agreement, *NantWorks is entitled to receive a preferred return* based upon net sales of DreamPlay Toys product sales and third-party license fees. *The Company retains the financial risk of the joint venture and is responsible for the day-to-day operations, including development, sales and distribution, for which it is entitled to receive any remaining profit or is responsible for any losses, and the results of operations of the joint venture will be consolidated with the Company's results.* Sales of DreamPlay Toys products have commenced in the third quarter of 2013.

In addition, the Company invested $7.0 million in cash in exchange for a five percent economic interest in a related entity, DreamPlay LLC, that will exploit the recognition technologies in non-toy consumer product categories. *NantWorks has the right to repurchase the Company's interest for $7.0 million.* The Company has classified this investment as a long term asset on its balance sheet.

56.    Thus, for its $8 million investment in the DreamPlay Joint Venture, JAKKS cedes a "preferred return" to Dr. Soon's NantWorks, but yet *"retains the financial risk of the joint venture* and is responsible for the day-to-day operations,

including development, sales and distribution, for which it is entitled to receive any remaining profit or is responsible for any losses…"  Such a deal, as described, is outrageously one-sided.  In addition, JAKKS has invested $7 million for a paltry 5% stake in DreamPlay, LLC (valuing that company at *$140 million*).  Should that $7 million be used to greatly increase the value of DreamPlay, NantWorks gets to buy back JAKKS' stake *at no profit to JAKKS*.  It is evident that the Board will pay any price to keep Dr. Soon happy, and entrench themselves in office.

### 3.    The Board Alters Berman's Pay Formula as a Further Act of Entrenchment

57.    In a further act of entrenchment, the JAKKS Board extended the employment contract of its failed CEO, Defendant Berman to December 31, 2018, despite the fact that the Company's shares are trading near an all-time low, and modified his employment contract so he can be paid huge bonuses despite the fact that the Company cannot meet EPS earnings goals.  An independent Board would have fired Berman.

58.    By amending Berman's employment contract to extend the term, an acquirer of the Company would owe Berman almost $12 million if he is terminated due to a change in control.  This sum, $12 million, *is equal to 10% of JAKKS' entire market value*.  Further, a change in control is defined to include the situation where a majority of the JAKKS directors are not re-elected.

59.    Traditionally, the CEO's compensation was based on performance.  As set forth in the JAKKS' 2010 Proxy Statement at p. 7:

> The Compensation Committee has, with input from the Company's compensation consultant, Frederick W. Cook & Co., Inc. ("FWC"), established target performance levels for incentive bonuses based on a number of factors designed to further our executive compensation objectives, including our performance, the compensation received by similarly situated executive officers at peer group companies, the conditions of the markets in which we operate and the relative earnings performance of peer group companies.

60.    The 2010 Proxy Statement goes on to discuss that compensation and bonus payments were set based on meeting EPS target goals and compensation was compared with a comparable group of companies in the toy and gaming industries.

61.    However, the net result of this plan was not good for Berman. Since JAKKS has performed so poorly, Berman did not receive the compensation he desired.  For instance, in 2011 and 2012, Berman received no bonus or option award, because the Company did not meet performance goals.

62.    For 2013 and beyond, Berman's employment agreement was changed to remove the requirement that the Company meet EPS performance goals.  As stated in the most recent Proxy Statement dated October 28, 2013:

> Mr. Berman's agreement as in effect on January 1, 2012 provided for an annual grant of $500,000 of restricted stock, the initial vesting of which depended *solely on EPS targets established in the agreement*; if initial vesting occurred, then the restricted stock vested over time.
>
> Pursuant to a September 2012 amendment to Mr. Berman's employment agreement, commencing in 2013, his annual bonus has been restructured so that part of it is now capped at 300% of his base salary and the performance criteria and vesting are solely within the discretion of the Compensation Committee, which will establish all of the criteria during the first quarter of each fiscal year for that year's bonus, *based upon financial and non-financial factors selected* by the Compensation Committee, and another part of his annual performance bonus *will be based upon the success of a joint venture entity we initiated in September 2012.*  The portion of the bonus equal to 200% of base salary is payable *in cash* and the balance in restricted stock vesting over three years. *In addition, the annual grant of $500,000 of restricted stock was changed to $3,500,000 of restricted stock and the vesting criteria was also changed from being solely based upon established EPS targets* to being based upon performance standards established by the Compensation Committee during the first quarter of each year. (Emphasis added.)

63    Thus, Berman's restricted stock award has been increased 600% and vesting criteria relaxed, despite the Company's many reversals under his leadership. This is facially irrational.  Amazingly, Berman's employment agreement was also amended in December 2012 to extend the term until December 31, 2018.  This is inconceivable given the harm Berman's tenure has done to the Company.

64.    Thus, now Berman can be paid significant sums throughout his extended term of employment while the Company continues to languish in the depths, with its share price near an all-time low.  Independent Directors on an independent Board would have fired Berman.   Further, since this new employment arrangement was so unfair, the Board couched its description in the Proxy Statement in obfuscatory, vague and misleading language so that the shareholders would not understand what was actually transpiring.   They then asked the shareholders to endorse what they could not understand in a "say on pay" advisory vote.

65.    Such a compensation agreement cannot be the result of a reasoned business decision but rather reflects the relationship between Berman, Glick and Miller, and/or Berman's domination of the two directors.

**B.    ALLEGATIONS PERTAINING TO THE CLASS ACTION LITIGATION**

66.    What follows are the key allegations contained in the Securities Class Action. (*See, e.g. Melot v. JAKKS, Inc., et al.*; 13 CV 5388, United States District Court, Central District of California.)  Plaintiff does not allege that these allegations are true, but rather that they have been made and if proven would subject the Company to significant liability.  If such liability is proved, Plaintiff seeks damages and/or contribution from the relevant Individual Defendants, the ones responsible for having caused the harm to JAKKS, rather than allowing the innocent shareholders to bear such cost.

67.    The allegations are as follows with respect to the period July 17, 2012 and July 17, 2013 (the "Class Period"):

a.    Throughout the Class Period, Defendants Berman and Bennett made materially false and misleading statements regarding the Company's business and operations and/or failed to disclose that: (i) the Individual Defendants had consistently manipulated JAKKS' sales and forecast numbers in order to mislead investors; (ii) JAKKS systematically laid off workers at the end of a quarter in an effort to meet earnings projections and rehired workers to fill the same positions at the start of the following quarter; (iii) to secure licenses for popular trademarks and brand names, the Individual Defendants guaranteed minimum royalty payments, knowingly or recklessly disregarding that the Company would be unable to meet the minimum sales needed to cover those payments, thereby incurring substantial write-downs; and (iv) Defendants were aware that the Monsuno and Winx lines performed poorly upon their launch yet continued to tout their success to unsuspecting investors.

b.    Despite claiming consistent revenue growth, confidential witnesses reveal that JAKKS' high level executives had unfettered access to and manipulated the Company's sales and forecast numbers, deceiving the investors about JAKKS' financial health.    The Class Action Complaint alleges that class counsel or their agents interviewed former JAKKS employees who provided information that was incorporated into the Class Action Complaint.    Plaintiff's counsel here has not interviewed any of these witnesses but is providing the information alleged in the Class Action Complaint.    The witnesses are referred to as Confidential Witnesses or "CW." For example, CW 1, JAKKS' controller and Executive Vice President, who reported directly to Defendant CFO Bennett and designed the sales and forecasting system at JAKKS, observed that the forecasts he/she prepared were often overridden by his/her superiors, Defendants Berman and Bennett. CW 1 remarked that "the salespeople would put in their numbers and when it came time to designating the number on forward looking statements, it didn't jive with the system." According to CW 1, "[t]he numbers [CW 1] gave were accurate"

1  but "the CEO kept telling me my numbers were wrong," thereby inflating the

2  Company's sales forecast.

3          c.     In addition, confidential witnesses also revealed that in an effort

4  to meet earnings projections, JAKKS routinely laid off workers before the end of the

5  quarter and often rehired workers to fill those positions in the subsequent quarter.

6  For example, CW 9, who helped supervise the design, marketing, and sales of

7  several lines of toys at JAKKS, remarked that every three months, the Company

8  would lay off a large number of workers, with the firings timed to occur several

9  weeks before the end of the fiscal quarter. Workers were rehired the following

10  quarter to fill the same positions. JAKKS carried on this illicit practice without a

11  whisper to the market.

12          d.     Defendants misled the public regarding the success of its newly-

13  introduced toy lines Monsuno and Winx, which they repeatedly claimed were

14  "showing strong momentum" with "orders on hand and our forecast in-house

15  through both U.S. and international...growing expeditiously," and the "sell-

16  throughs...well beyond what we ever expected." In stark contrast to Defendants'

17  assurances, however, confidential witnesses confirm that Monsuno and Winx

18  underperformed from the outset. For example, CW 3, who was monitoring sales at

19  one of JAKKS' largest customers, recalls that the Monsuno toy line performed

20  poorly from its launch, and that executives at JAKKS were privy to this information.

21          e.     Following Defendants' repeated guarantees of growth and

22  projected sales revenue increases, on July 17, 2013, after the market close, JAKKS

23  shocked the market when it suddenly slashed its full-year forecast of revenue and

24  earnings, citing poor sales and lackluster performance from the Monsuno and Winx

25  Club line of products. In response, the Company said it would suspend its dividend,

26  and implement a restructuring plan involving a "substantial reduction of leased

27  space, employees and other overhead expenses." Moreover, in a conference call

28  held with investors that same day, the Company blamed its earnings miss in part on

1  "charges for license minimum guarantee shortfalls of $14.1 million," essentially

2  admitting that the Company was simply unable to meet its minimum guarantee

3  agreements with its licensors without incurring significant charges. This news sent

4  JAKKS' shares into a tailspin, dropping approximately 39% from a close of

5  $11.48/share on July 17, 2013, to a close of $7.00/share on July 18 2013.

6           f.      Numerous confidential witnesses interviewed by or on behalf of

7  counsel in the Class Action, and as alleged in the Class Action Complaint,

8  corroborated that the Defendants Berman and Bennett had continuous and

9  unrestricted access to the Company's current sales figures and forecasts via its

10  JAKKS.net system and also were apprised of all changes in sales and projections in

11  weekly meetings with its Controller. CW 1 served as the Controller and Executive

12  Vice President at JAKKS from 2010 until he was terminated in October 2012.

13  Based at the Company's headquarters in Malibu, California, CW 1 reported directly

14  to Defendant CFO Joel Bennett. CW 1 was responsible for overseeing JAKKS'

15  finances. CW 1 designed the sales and forecasting system at JAKKS, and managed

16  the Company's sales meetings. CW 1 was hired to fix JAKKS' finance and

17  forecasting systems after a massive loss at JAKKS on or about Q4 2009 or Q1 2010.

18  When CW 1 joined JAKKS, the Company had no meaningful forecasting controls in

19  place. CW 1 built a detailed in-house forecasting system that examined volumes

20  and forecasted each customer's sales by month. The forecasts were maintained in a

21  spreadsheet format. CW 1 produced an internal report on a weekly basis, which

22  broke down the actual sales for each toy line by each customer in every region of the

23  country. The report compared the actual sales to the budgeted forecast of sales. CW

24  1 emailed the report to the Individual Defendants. CW 1 and the Individual

25  Defendants met on a weekly basis to discuss the actual sales against the forecasts.

26  The weekly forecast showed the executives how each toy line was performing and

27  which customers were purchasing the Company's toys, and in what quantities.

28

g.    CW 1 also explained that to minimize losses, CW 1 implemented a system in which JAKKS received point-of-sale data from large retailers immediately after a toy was launched.  This meant that the Company and its chief executives knew almost immediately after a product was launched how it was performing.    This way, JAKKS could promptly cease production of underperforming toys.  The Individual Defendants saw this detailed information in the forecasts and Excel spreadsheets.  CW 1 provided them on a weekly basis. Thus, the Individual Defendants could review sales by toy line, by store, by region, as well as ascertain which toys were sitting on the shelves.  CW 1 observed that Defendants Berman and Bennett did away with this system after CW 1 left the Company because they did not want the sales force spending their time examining the sales data instead of selling toys.

h.    The Company's published forecasts were primarily based on estimates obtained from the sales team. The salespeople provided confidence levels for the forecasts, and the progress of anticipated sales was continuously monitored. CW 1 informed management of all changes in product demand: if the numbers on a product started waning, CW 1 would promptly apprise management.

i.    CW 2 worked as an executive assistant to JAKKS' Senior Vice President of domestic sales, Ken Price, from June 1999 to late June 2012.  CW 2 worked in the New York office, which houses many of the Company's sales executives.  As a long-time employee and executive assistant to a vice president, CW 2 was familiar with how sales forecasts were compiled and disseminated throughout the Company. CW 2 remarked that JAKKS' sales executives regularly received sales figures and forecasts of pending deals from various regions of the country.  Price received sales forecasts for domestic sales, and Vice President of International Sales Carmine Russo received sales forecasts for international sales. Price was responsible for compiling the domestic sales forecast every quarter into a report.  This report was composed of sales forecasts drawn from sales staff located

1 throughout the country. The forecasts were based upon sales figures from retail

2 stores and merchants. According to CW 2, the quarterly sales reports were sent to

3 the Company's executives, including Defendant Berman. JAKKS' executives would

4 also request additional sales forecasts between quarters.  Carmine Russo also rolled

5 up the sales numbers from overseas and sent quarterly sales reports and forecasts,

6 for international sales, to Berman and Bennett in California.

7          j.     CW 3 worked as a business analyst for JAKKS from January

8 2011 to September 2012.  CW 3's responsibilities included receiving sales data for

9 all of JAKKS' products from two major vendors, Amazon.com and Toys R Us,

10 which CW 3 would then compile and forward to executives at the Company's

11 headquarters in California.  CW 3 worked in the New York office, which housed

12 many of the executives in the Company's sales division.  CW 3 reported to Vice

13 President of Sales Dan Cooney.  Every week, CW 3 sent sales data from Toys R Us

14 and Amazon.com to the executives in California, as well as most of the top

15 executives in the marketing department.  CW 3 said that other business analysts

16 received similar data from all the large chain stores who sold JAKKS' products,

17 including Wal-Mart and Kohl's.   Those analysts also sent sales data to the

18 Company's top executives on a weekly basis.  The sales data was referred to as the

19 "R Report."  Sales forecasts, compiled by sales coordinators, were produced using

20 JAKKS' own software called "JAKKS' VI Tool."  As a result of the internal flow of

21 information, the CEO, COO and other top executives at JAKKS knew how well all

22 products were selling on a weekly basis.  The sales data was also made available to

23 Price and Russo.

24          k.     CW 4 worked as a business analyst for JAKKS from October

25 2011 to August 2012.  CW 4's responsibilities included receiving sales data for

26 JAKKS' products from Wal-Mart, one of JAKKS' largest retailers, and producing

27 forecasts for future sales.  CW 4 worked out of the Company's office in Bentonville,

28 Arkansas and reported to Senior Vice President of Sales Bryan Shoe.  CW 4

received sales data from Wal-Mart and, using a number of variables, including past sales, marketing, and anticipated consumer demand, CW 4 prepared forecasts for future sales at Wal-Mart.  These forecasts were provided both to Wal-Mart, to help the retailer make decisions about inventory, and to JAKKS' executives.  JAKKS used a web-based system called "JAKKS.net" to prepare forecasts.  CW 4 and other analysts entered their forecasts into the system as soon as they were generated.  CW 4 added forecasts to the system on a daily or weekly basis. Forecasts for the sales of JAKKS' products were listed by product name and by the retailer in which the product was sold. The forecasts on JAKKS.net were visible to large numbers of sales staff, including all inside analysts, account managers and senior vice presidents. According to CW 4, the numbers were "rolled up" to all levels of management. "Anybody had full visibility of what you were forecasting," said CW 4.

l.      CW 5 worked at JAKKS as an associate product manager from November 2010 to August 2011 and as a brand manager from August 2011 until March 2013.  Both of these positions were in the Company's marketing department. During that time, CW 5 routinely reviewed the sales data and sales projections of several products.  Sales representatives obtained point of sale ("POS") data directly from major retailers, including Wal-Mart, K-Mart, Target, and Toys R Us.  The sales representatives then entered the sales data into JAKKS.net, the Company's online network.  Sales projections were developed in collaboration between JAKKS' marketing and sales departments.  According to CW 5, sales projections were also placed on JAKKS.net. CW 5 noted that point-of-sale data from retailers was updated at least weekly, and many individuals in both the sales and marketing divisions had access to all or some of the data on the network through a log in system.  Data could also be extracted from the site and emailed to other parties in the form of a Microsoft Excel document.

m.    Throughout the Class Period, Defendants Berman and Bennett continuously touted JAKKS' financial growth and stability. For example, for full year 2012, Defendants forecasted a 6.2% to 7.4% increase in net sales from the prior year to a range of $720 to $728 million, and represented that the Company is "on track for meeting [its] guidance for the full year." Even after they subsequently reduced the guidance for 2012 in December, Defendants still projected profitability for 2013, with "an increase in net sales of 4% to 5% to approximately $694 to $700 million," emphasizing that JAKKS "will return to profitability in 2013." These and similar representations, however, were false and misleading as these Individual Defendants continuously manipulated the Company's reported sales forecasts.

n.    According to CW 1, the forecasts prepared by CW 1 were often overridden and manipulated by the Individual Defendants. CW 1 remarked that "the salespeople would put in their numbers and when it came time to designating the number on forward looking statements, it didn't jive with the system." CW 1 emailed his superior, Defendant Bennett, just before he was laid off, that CW 1's forecasting showed sales numbers much lower than what Defendant Berman was forecasting. CW 1 remarked that his email to the CFO describes these discrepancies in detail. CW 1 noted that the email "fell on deaf ears." CW 1 believes he was terminated because of his persistence on this issue. CW 1 remarked that "the numbers I gave were accurate, based on the forecasts from the sales group" but "the CEO kept telling me my numbers were wrong and that he talked to the sales guys, and the numbers were wrong." CW 1 explained that he went back to all the sales people to ask if they changed their forecast numbers to the numbers the CEO had and was told by the sales people that they did not change their numbers. CW 1 said that when Q2 2012 numbers were reported to his superiors, they were exactly as he had previously forecasted. As far as CW 1 knew, Defendant Berman just changed numbers as he saw fit, so there was no reason the Individual Defendants would need to get any salespeople to adjust their forecasts.

1    o.    CW 1 explained that in addition to the sales and forecast system,

2  JAKKS had a second IT/production system, which was controlled by the Chief

3  Operating Officer, John McGrath.  Before CW 1 was terminated, CW 1 had been

4  working on tying the forecast system into the IT/production system.  This would

5  have allowed the Company to accurately predict which products were suffering and

6  to avoid excess inventory.  The IT/production system would have made it more

7  difficult for management to manipulate the forecasts as they saw fit.  CW 1 believed

8  that his involvement in the IT/production system was another reason for his

9  termination.

10    p.    According to CW 1, McGrath brought in an individual with no

11  formal education named Adam Prump (spelled phonetically).  CW 1 described

12  Prump as the "henchman" at JAKKS who followed the instructions of senior

13  management.  Prump had control of the IT/production system, which allowed him to

14  change sales forecast on the production side. Prump had access to all the passwords

15  needed to make changes in the system.  Prump pressured Ken Price, who was the

16  senior sales person and Executive Vice President for JAKKS' core business.  Price

17  reported directly to Defendant Berman.  Price would typically make high-level sales

18  estimations.  According to CW 1, Price had been pressured by senior management

19  to manipulate sales numbers and wrote a letter of protest to senior management.

20    q.    CW 6 worked in JAKKS' sales division from 1996 to August

21  2012.  He joined the Company as a sales analyst and was later promoted to sales

22  manager, reporting directly to Ken Price, the Executive Vice President of domestic

23  sales, from October 2001 until he left the Company.  CW 6 rolled up JAKKS'

24  domestic sales each quarter.  CW 6's responsibilities included collecting sales

25  numbers from different divisions within the Company and helping Price organize

26  quarterly forecasts for domestic sales.

27    r.    CW 6 would help tally the numbers from the Company's

28  different domestic sales divisions and compile them into a report.  Price sent the

1    sales forecasts to the executives at the Company's headquarters in California. Each

2    quarter, CW 6 saw the dollar amount of total domestic sales forecasted for the

3    following quarter. After Price sent out the report to headquarters, CW 6 often would

4    listen to or read an account of the Company's quarterly earnings call with analysts

5    and shareholders. In these public statements, the Individual Defendants would

6    present a forecast for the net sales of the company, equivalent to the domestic sales

7    plus the international sales. Based upon the report sent by Price to the Company's

8    executives, the numbers provided by the Individual Defendants to investors and

9    analysts were inflated. According to CW 6, "the numbers they were giving were too

10   high."

11            s.    CW 7 worked at JAKKS for over a decade, holding a number of

12   high-level positions, including as Director of Marketing and Licensing, Vice

13   President of Marketing and Licensing, and Senior Vice President of Licensing and

14   Media. According to CW 7, Price made a formal complaint to the Company (wrote

15   a letter) because he did not believe in the Company's sales forecasts. Specifically,

16   Price complained that the sales numbers reported to investors were not matching the

17   Company's internal reports.

18            t.    While Defendants announced increased revenues from sales and

19   maintained that JAKKS was "on track" to meet its guidance, Defendants concealed

20   that the Company engaged in systematic layoffs prior to the end of each quarter in

21   order to make its numbers, and rehired workers the following quarter to fill those

22   same positions. Defendants failed to disclose that JAKKS' perceived ability to meet

23   its guidance did not stem from organic sales but instead was a product of

24   machinations.

25            u.    CW 3 explained that quarterly layoffs occurred at the end of the

26   fiscal quarters in 2012 when it looked like the Company was not going to "make its

27   numbers," i.e., its sales goals. JAKKS' employees would be fired to lower the

28   Company's costs and recorded overheard, lending an appearance of financial

1   viability.  The number of employees who were fired depended on the financial goals
2   set for the quarter.  "They had a number they had to meet," CW 3 said, "and if we
3   weren't going to make our numbers, a certain number of people had to get fired."

4       v.  CW 8 worked as the lead designer for JAKKS' line of Winx Club
5   dolls from October 2010 to July 2013.  CW 8 observed that the Company engaged
6   in systematic layoffs at the end of the Company's fiscal quarters.  It was "common
7   knowledge" at JAKKS that employees were laid off in order to lower costs and
8   make the Company's finances appear healthier to investors.  Employees considered
9   the quarterly layoffs a type of "lottery" in which a certain number of people would
10  invariably be terminated.  "Everyone there knew it," said CW 8.  In many cases,
11  these same positions from which employees had been fired would be filled at the
12  beginning of the following quarter.

13      w.  CW 9 was an associate brand manager at JAKKS from August
14  2011 to March 2013.  CW 9 helped supervise the design, marketing, and sales of the
15  Company's Marvel, DC, Star Wars, and Power Rangers' lines of toys.  CW 9
16  reported to the Director of Marketing. CW 9 observed frequent layoffs at JAKKS
17  during his/her tenure.  While the brands for which CW 9 was responsible were
18  performing relatively well and meeting internal projections, CW 9 was aware,
19  through conversations with co-workers that other parts of the company were doing
20  poorly.  According to CW 9, "a lot of people were talking about how [the Company]
21  wasn't doing well." CW 9 noticed that approximately every three months, the
22  Company would lay off a large number of workers.  The firings appeared to be
23  timed to occur several weeks before the end of the financial quarter.  CW 9 also
24  observed that the Company would often hire new workers several weeks after there
25  had been a round of layoffs, i.e., after the financial quarter had ended. These
26  workers would often hold the same position as workers who had been laid off.

27      x.  CW 10 was a senior brand manager at JAKKS from February
28  2011 to October 2013. CW 10 reported to the Company's Director of Marketing,

Josh Weichbrodt, who reported to Tara Hefter, the Vice President of Global Licensing. CW 10 also observed regular layoffs at the Company. CW 10 described morale as "low." CW 10, too, noticed a pattern wherein many employees were consistently fired before the end of a quarter. CW 10 remarked that "they planned to do it every quarter." CW 10 also observed that new employees were often hired at the beginning of a new quarter.

        y.    "Substantially all of [JAKKS'] net sales" derive from sales of products under trademarks or brand names licensed from other sources. In its filings, JAKKS represented only that some "license agreements generally require [it] to make specified minimum royalty payments, even if [the Company] fail[s] to sell a sufficient number of units to cover these amounts." Defendants allegedly concealed, however, that in order to secure licenses to popular brands and trademarks, the Defendants guaranteed minimum royalties knowing the Company was unable to generate sufficient sales to cover said payments, resulting in massive write-offs.

        z.    CW 1 explained that JAKKS wrote a number of "pretty hefty licensing agreements that contained minimum guarantees. Under a minimum guarantee agreement, JAKKS would guarantee a company from whom it is licensing a certain amount of royalty payments, regardless of the actual revenues generated from the product. According to CW 1, the minimum license guarantees were written off once a product was determined to be unsuccessful, even if that event preceded the contract dates when the license guarantees were due. The sales and forecasting system at JAKKS also were used to determine which products should be written off. JAKKS' senior management knew they were going to have to write off some guarantees.

        aa.    CW 7 similarly observed that, typically, the Company's contracts with licensors are signed by the Individual Defendants and other top management. CW 7 stated that Defendant Berman signs off on every contract and that Berman is

1  always carefully vague in investor calls when talking about which accounts caused

2  minimum license guarantee write-offs. According to CW 7, a JAKKS employee

3  reporting directly to CW 7 told CW 7 that he/she was directed by Defendant Berman

4  to take Executive Vice President of Sales Ken Price's name off a contract because he

5  refused to agree to its terms. The reason for Price's refusal was that he knew it was

6  an unattainable guarantee amount and objected to its execution. The contract was

7  for approximately $100 million and was related to a Disney segment.

8         bb.   Defendants attributed JAKKS's second quarter 2012 results, with

9  a 10% increase in sales to $145.4 million from the prior year period to "the

10  expansion of the Monsuno toys...and [the] Winx Club [line]...both of which are

11  already showing strong momentum." Defendants offered upbeat guidance for 2012,

12  anticipating growth in net sales in the range of $720 million to $728 million, with

13  Monsuno "growing...rapidly" and "expeditiously" and the launch of the Winx Club

14  line "off to an amazing start." Contrary to these rosy depictions, however,

15  confidential witnesses confirm that the Monsuno and Winx lines underperformed

16  from their initial launch and at least as early as June 2012. Despite this failure,

17  Defendants knowingly continued to mislead investors about the products' success. In

18  fact, on October 23, 2012, when an upset shareholder questioned the Company's

19  "wondrous prospects of Monsuno" and opined that "these failed to do," Defendant

20  Berman was quick to disagree: "I will disagree with you on Monsuno. Monsuno has

21  done terrific for us as a company. We have a very solid business."

22         cc.   During his/her tenure at JAKKS, CW 6 was present for the

23  launch of JAKKS' Monsuno and Winx Club toy lines. Based on CW 6's receipt of

24  domestic figures, it was quickly apparent that the lines were underperforming. The

25  lines launched around March 2012. According to CW 6, based on the Defendants'

26  Berman and Bennett's receipt of quarterly sales figures, they would have been

27  apprised of the lines' severe underperformance by June 2012.

28

dd.    CW 3, who was monitoring sales at Toys R Us in 2012, similarly recalls that the Monsuno toy line underperformed at Toys R Us from the time of its launch.  According to CW 3, this sales data was transmitted to the top executives at JAKKS.

ee.    CW 8, who worked as the lead designer for JAKKS' line of Winx Club dolls from October 2010 to July 2013, observed the toy line's design and its final production.  As its lead designer, CW 8 paid close attention to the performance of the Winx Club line of dolls. By mid-2012, CW 8 was aware of the fact that the line of dolls did not perform in line with the Company's expectations and the sales were lower than forecasted.  The line's underperformance is attributable to a shift in toy preferences among children towards electronic, smart-phone-type toys, and also to a decision by the television channel Nickelodeon to air a television series entitled "Winx Club," featuring the characters depicted in the toy line, at night instead of in the afternoon, a time slot when the target demographic for the Winx Club line— young children—was unlikely to watch television.

ff.    CW 11 was a sales and account analyst for JAKKS from August 2011 to March 2013.  CW 11 analyzed sales figures received from K-Mart and Kohl's, who sold many of JAKKS' toy lines.  CW 11 reported to the Vice President of Sales.  CW 11 stated that the Monsuno and Winx Club lines underperformed from the outset.  CW 11 received information from K-Mart and Kohl's about the sales figures of the company's Monsuno and Winx Club toy lines.  Because she received sales figures from K-Mart and Kohl's on a regular basis, she had "the initial reads" on sales of the two lines when they first launched.  Almost immediately after the lines' launch - sometime in early 2012 - it was clear that the lines were not flying off the shelf and were in fact failing to meet the Company's forecasts.  K-Mark and Kohl's sent sales figures directly to CW 11 on a daily or weekly basis.  Based upon his/her review of the sales figures, CW 11 relates that it was readily apparent that they "weren't good" and were not in line with the expectations laid out by JAKKS'

management.    When CW 11 received sales figures from K-Mart and Kohl's regarding specific brands, including Monsuno and Winx, CW 11 would apprise both the brand managers who managed these toy lines and the account managers who managed the accounts with K-Mart and Kohl's of the relevant sales figures. CW 11 sent weekly, sometimes daily, reports on sales figures related to all toy lines, including Monsuno and Winx, to the brand managers and account managers. These reports were sent to "everyone who touched the brand," which included individuals in both the marketing and sales departments. Therefore, brand managers associated with Winx and Monsuno were well aware of the lines' underperformance within weeks of their launch.

gg.    On July 17, 2012, the Company issued a press release announcing financial results for the second quarter 2012 ("2Q 2012"). The Company reported that "[n]et sales for the second quarter of 2012 were $145.4 million, up from $131.9 million reported in the comparable period in 2011." The Company also reported that earnings were down from the prior year: "[e]xcluding the legal and financial advising fees, second quarter earnings would have totaled $1.6 million, or $0.06 per diluted share, compared to $4.9 million, or $0.18 per diluted share, in 2011."

hh.    Quoting Defendant Berman, the press release focused on the reported sales growth, including "strong momentum" from the Monsuno and Winx lines:

> We are pleased with the sales growth in the second quarter and year to date, and we are on track to meet our guidance ranges for the full year. Highlights of our second quarter include the expansion of the Monsuno toys in the US and the launch internationally of the animated series and related toy products, which has met the Company's expectations to date, and our Winx Club dolls and Big Wheel line launched at select major retailers, both of which are already showing strong momentum. Our outlook for the third quarter remains optimistic with contributions from a broad range of products including our growing pool of owned content.

ii.    The press release then offered the following upbeat guidance for 2012, including an increase in the projected earnings per share:

> For 2012, the Company continues to expect an increase in net sales of 6.2% to 7.4% to approximately $720 million to $728 million, with revised diluted earnings per share in the range of approximately $1.04 to $1.08, giving effect to the repurchase of common stock pursuant to the self-tender and the related anticipated financing costs and excluding the financial and legal advisory fees. The Company's previous guidance for diluted earnings per share was in the range of $1.01 to $1.07, excluding the financial and legal advisory fees.

jj.    During an earnings call with analysts to discuss its second quarter results, Defendants Berman and Bennett again reaffirmed the guidance for full year 2012 and assured investors that sales from the Monsuno and Winx Club lines were solid and would continue that trajectory:

> <Berman>: I'd like to start off by saying that we are very pleased with the sell-in of our products for the second quarter and year-to-date and we are on track for meeting our guidance for the full year. We are working hard to bring high quality and compelling play things to market while tightly managing our business and increasing profitability.
>
> Highlights for our second quarter include strong sell through of our Monsuno toys in the U.S. and the ongoing launches of the toy line and animated series internationally in the markets like the UK, Italy and Australia. Our Winx Club Dolls are off to a positive start and our Big Wheel line launched at select major retailers in June and is already showing strong momentum.
>
> * * *
>
> <Bennett>: As per our earnings guidance for 2012, we're still anticipating growth with net sales in the range of $720 million to $728 million...
>
> * * * *
>
> <Berman>: Again, we are very pleased with the results of our second quarter of 2012 and feel positive about our prospects for the remainder of the year, including the ever important holiday season with the initial success of Monsuno, Winx Club, and Big Wheel, and the broad placement of out wide range of products going into the fall 2012 year.

We have some really terrific products in our portfolio and have both new and evergreen contributions coming across all JAKKS divisions this year.

*** 

<Q -Aryind Bhatia>: Okay, a couple things here. One, I know you're not disclosing the amount of business you're doing with Monsuno today, but I would just like to, maybe, get some color on the domestic versus international mix. And should we be expecting Monsuno to become, say, about 10% of your business here in the coming year or two? Just broadly, ii you can put some brackets around how to expect revenue, about how we should model this.

<A -Stephen G. Berman>: Well, as you know, we, as for competitive reasons, not just for our competitors, but also for retailers, we do not break out the percentage of anyone specific category. But I will give you some flavor of Monsuno, both in North America; call it U.S., and International It's growing. It's growing, I would say, rapidly. During the summer months, remember, for majority of toy companies things are a slow period. It's very seasonal. People are getting back to school.

But the orders on hand and our forecast in-house through both U.S. and international is growing expeditiously. And we had a very promising event through our partner Bandai, in Japan, and they're focused very strongly in Japan, which we believe and they believe will be probably the one of on the number one boy's toy properties in Japan. We also have extremely strong promising new ventures in Korea. That's not just to say our international, call it, Western Europe and Eastern Europe, business is growing, so we are extremely excited about Monsuno and we're looking forward to the years ahead with it

*****

<Berman>: But while you asked about Monsuno, we launched the Winx Club recently, and from our retailers' point of view and from JAKKS1 point of view, the sell-throughs are well beyond what we ever expected. So that's off to an amazing start.

JAKKS Pacific Q2 2012 Earnings Call, July 17, 2012.

kk.    The foregoing statements were allegedly materially false and misleading because they misrepresented and/or failed to disclose the following:

(i)    the Individual Defendants had access to and consistently manipulated JAKKS' sales and forecast numbers in order to present an image of consistent growth;

(ii)    JAKKS methodically laid off workers in an effort to meet earnings projections and rehired workers to fill the same positions at the start of the following quarter;

(iii)    to secure licenses for popular trademarks and brand names, the Individual Defendants guaranteed minimum royalty payments knowingly or recklessly disregarding the Company's inability to meet the minimum sales needed to cover royalty payments, thereby incurring substantial charges; and

(iv)    Defendants in the class action knew that the Monsuno and Winx lines of products performed poorly upon their launch yet Defendants continued to tout their success to the unsuspecting investors.

ll.    On August 7, 2012, the Company filed with the SEC a quarterly report on Form 10-Q for the period ended June 30, 2012, which included signed Certifications by Defendants Berman and Bennett, stating that the financial information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's financial reporting.  The report reiterated the Company's previously announced quarterly financial results and financial position. JAKKS reported net sales of $145.4 million for the second quarter of 2012, compared to net sales of $131.9 million in the same quarter the previous year. 2Q 10-Q 2012 at 4, 7 & 23.  With respect to the Traditional Toys and Electronics segment, the Company reported net sales of $72.0 million for the three months ended June 30, 2012, compared to $67.7 million for the prior year period, representing an increase of $4.3 million, or 6.4%. Id. at 24. "The increase in net sales was primarily due to the launch of the Winx Club dolls and sales contribution of [the Company's] recently acquired Moose Mountain division." Id.  For the Role Play, Novelty and Seasonal Toys segment, the Company reported net sales of $73.3

1  million for the three months ended June 30, 2012, compared to $64.2 million for the

2  prior year period, representing an increase of $9.1 million, or 14.2%. Id. "The

3  increase in net sales was primarily due to increases in unit sales of [the Company's]

4  Halloween costumes and accessories." Id. Earnings per share were 0.01 for the three

5  months ended June 30, 2012 vs. 0.16 for the three months ended June 30, 2011. Id.

6  at 11.

7          mm.   With respect to licensing and royalties, the 10Q disclosed only

8  that the Company's "license agreements generally require [it] to make specified

9  minimum royalty payments, even if [the Company] fail[s] to sell a sufficient number

10 of units to cover these amounts." Id. at 32.

11         nn.   The foregoing statements were materially false and misleading

12 for the reasons set forth in

13         oo.   On September 28, 2012, the Company issued a Press Release

14 announcing lower guidance for 2012, with anticipated net sales for the full year of

15 approximately $690 million to $700 million, representing a reduction from the

16 Company's previously anticipated full year net sales of approximately $720 million

17 to $728 million.  The Company also revised downward its non-GAAP earnings per

18 share to approximately $0.68 to $0.74, excluding non-recurring legal and financial

19 advisory charges of $0.19 per share, from its prior guidance of diluted earnings per

20 share in the range of approximately $1.04 to $1.08. JAKKS attributed the revised

21 guidance to "disappointing domestic product sales and a slow-down in product

22 orders, coupled with higher expenses, including marketing and advertising expense

23 commitments and minimum license royalty guarantees."

24         pp.   On this news, the price of JAKKS' shares dropped 4% from

25 $14.57 at the close of September 28, 2012 to $14.00 on October 1, 2012, on

26 unusually high trading volume of 1.52 million shares or six times the average daily

27 volume.

28

qq.    The foregoing statements were materially false and misleading for the reasons set forth above.

rr.    On October 23, 2012, the Company issued a press release announcing financial results for the third quarter 2012 ("3Q 2012"). The Company reported that "[n]et sales for the third quarter of 2012 were $314.5 million, compared to $332.4 million reported in the comparable period in 2011. "With respect to earnings, the Company reported that "[excluding the legal and financial advising fees, third quarter earnings would have totaled $31.2 million, or $1.13 per diluted share, compared to $35.3 million, or $1.11 per diluted share, in 2011."

ss.    Quoted in the press release, Defendant Berman again struck an optimistic note:

> In our third quarter we saw better than expected growth from our international business reflecting the success of our Monsuno line of toy products and solid performance from our Winx Club, Disney Princess and Disguise Halloween product lines. Our Monsuno, Winx Club, Cinderella and Big Wheels products, to name a few, have been received well at retail and have earned coveted positions on many retailer and media Hot Holiday Toy Lists both in the U.S. and abroad.
>
> We are in the midst of our Fall Toy Fair meetings with retailers, licensors and other industry partners and are excited by the enthusiastic response to our 2013 product line, including our new DreamPlay Toys products. We believe that our DreamPlay technology positions JAKKS to be a leader in interactivity and augmented reality play for children and will put JAKKS in the forefront of new trends with smart phones and other devices being used more and more each day by children of all ages for their gaming enjoyment and experiences. Looking ahead to 2013, we are optimistic about future opportunities including the launch of DreamPlay products and the solid performance of our core business lines, which spans a wide spectrum that includes action figures, dolls, dress-up and role play; Halloween costumes from Disguise, kids furniture and seasonal products from Kids Only; infant/pre-school products from Tollytots; ride-on vehicles and wagons from Moose Mountain, and outdoor and junior sports products and impulse toys from Maui Toys.

tt.    The press release then offered the following reduced guidance for 2012, albeit still projecting profitability after excluding one-time charges:

> As previously announced, the Company anticipates net sales for the full year of approximately $690 million to $700 million, with revised non-GAAP earnings per share in the range of approximately $0.68 to $0.74, excluding non-recurring legal and financial advisory charges of $0.19 per share . . . The revised guidance represents a reduction from the Company's previously anticipated full year net sales of approximately $720 million to $728 million and diluted earnings per share in the range of approximately $1.04 to $1.08, excluding the financial and legal advisory fees. The Company's guidance with respect to diluted earnings per share is a non-GAAP financial measure, due to the exclusion of such one-time charges.

uu.    In an earnings call discussing the Company's third quarter results, Defendants again led the market astray:

> <Q -Jonathon Troy Fite>: We've been shareholders of JAKKS for several years now and given our tenure, just bear with me for a moment. Early in our ownership, we watched you guys impressively navigate the downturn and even while you don't let the loss of key properties like WWF, but over the past two years or so, we've been baffled by some of your cap allocations decisions and I'd like to understand a little bit better your process -your thought process behind your capital allocation decision.
>
> Let me give you a few examples. So through the crisis, you managed the cash hoard, which was great. But rather than leveraging that cash hoard to pay down or renegotiate your convertible bonds, you refinanced the bonds with lower strike prices, which diluted your shareholders.
> Next, about 18 months ago, you began touting the wondrous prospects of Monsuno, but these failed to do, whether you've severely missed your earnings projections in 2011 and you've lowered expectations again for 2012.
>
> Most recently, you refused to negotiate in good faith with the firm willing to offer shareholders $20 plus, but instead you decided to spend shareholder money on a tender at the same price. Since that tender took place, you've weakened the balance sheet and provided over a 30%

drop in the share price, yet you re-hedge your compensation contracts renewed at pretty substantial levels. So can you explain to me why you might deserve to have that contract renewed and why you think your capital allocation record over the past three years really deserves to be rewarded?

\* \* \*

<A -Stephen G. Berman>:.../ will disagree with you on Monsuno. Monsuno has done terrific for us as a company, maybe it has fluctuated versus U.S. to international, but we have a very solid business, we still have a very solid balance sheet, we try to appease as many shareholders as we can.

JAKKS Pacific Q3 2012 Earnings Call, October 23, 2012

vv.   The foregoing statements were materially false and misleading for the reasons set forth above.

ww.   On November 9, 2012, the Company filed with the SEC a quarterly report on Form 10-Q for the period ended September 30, 2012, which included signed Certifications by Defendants Berman and Bennett, stating that the financial information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's financial reporting.  The report reiterated the Company's previously announced quarterly financial results and financial position.  JAKKS reported net sales of $314.5 million for the third quarter of 2012, compared to net sales of $332.4 million in the same quarter the previous year. 3Q 10-Q 2012 at 4, 7 & 23.  With respect to the Traditional Toys and Electronics segment, the Company reported net sales of $171.2 million for the three months ended September 30, 2012, compared to $163.2 million for the prior year period, representing an increase of $8.0 million, or 4.9%. Id. at 24. "The increase in net sales was primarily due to the launch of Power Train, action figures based on the animation series Monsuno®, Disney® large dolls and accessories, Winx Club® dolls and sales contribution of [the Company's] recently acquired Moose Mountain division." Id. For the Role Play, Novelty and Seasonal Toys segment, the Company

1 | reported net sales of $143.3 million for the three months ended September 30, 2012,
2 | compared to $169.2 million for the prior year period, representing a decrease of
3 | $25.9 million, or 15.3%. Id. "The decrease in net sales was primarily due to
4 | decreases in unit sales of [the Company's] Disney Princess® dress up and role play
5 | items, Halloween costumes and accessories and [the Company's] kids outdoor
6 | furniture and activity tablets." Id. Earnings per share were 1.38 for the three months
7 | ended September 30, 2012 vs. 1.32 for the three months ended September 30, 2011.
8 | Id. at 12.

9 |      xx.    The 10-Q also reported that on September 12, 2012, the
10 | Company entered into a joint venture called DreamPlay Toys with Dr. Soon's
11 | NantWorks, LLC ("NantWorks"), in which it owns a fifty percent interest, in order
12 | to obtain "the exclusive right to arrange for the provision of the NantWorks platform
13 | for toy products." 3Q 10-Q 2012 at 15. The consideration paid by the Company
14 | consists of cash in the amount of $8.0 million and a warrant issued to NantWorks to
15 | purchase 1.5 million shares of JAKKS' common stock at an exercise price of
16 | $16.2823 per share. The warrant has an option value of $7.0 million.

17 |      yy.    With respect to licensing and royalties, the 10Q disclosed only
18 | that the Company's "license agreements generally require [it] to make specified
19 | minimum royalty payments, even if [the Company] fail[s] to sell a sufficient number
20 | of units to cover these amounts." Id. at 32.

21 |      zz.    The foregoing statements were materially false and misleading
22 | for the reasons set forth above.

23 |      aaa.    On February 21, 2013, the Company issued a press release
24 | announcing financial results for the fourth quarter 2012 ("4Q 2012"), and the full
25 | year 2012 ("FY 2012"). The Company reported that "[n]et sales for the fourth
26 | quarter of 2012 were $133.5 million, compared to $141.1 million reported in the
27 | comparable period in 2011," while "[n]et sales for the full year of 2012 were $666.8
28 | million compared to $677.8 million in 2011." With respect to earnings, the

Company reported that "[excluding the legal and financial advisory fees and expenses and the deferred tax asset impairment charge, the fourth quarter net loss in 2012 would have totaled $27.2 million, or $1.24 per diluted share, compared to a loss of $18.8 million, or $0.72 per diluted share, in 2011, while "[excluding the deferred tax asset impairment charge and legal and financial advisory fees and expenses, the full year 2012 results would have been a loss totaling $9.3 million, or $0.39 per diluted share, compared to earnings of $10.9 million, or $0.41 per diluted share, in 2011."

bbb.   In the press release, Defendant Berman acknowledged the disappointing fourth quarter performance that led to a sharp miss of prior guidance:

> We are disappointed by our performance in the fourth quarter. The difficult and challenging toy environment did not generate the sales that had been anticipated, and several of our key products did not achieve the sales levels that we had planned for, also resulting in license royalty minimum guarantee shortfalls."

ccc.   Despite the bad news, Defendant Berman again struck an optimistic tone:

> However, we are optimistic for our future growth and profitability. We believe that our core business lead by our infant/preschool, seasonal and Halloween segments, in conjunction with meaningful reductions in operating costs, will return the Company to profitability in 2013.
>
> We believe that the difficult environment for toys in 2012 resulted from rapid changes in children's play patterns as tablet and smartphone devices and interactive games and toys have more and more become cornerstones of their play and fun experiences. We recognize that it is critical for us to provide new, more exciting and magical experiences for today's child compatible with these new play patterns. We believe that our partnership with NantWorks in creating our DreamPlay line of toys using NantWorks proprietary iD recognition technology will place JAKKS in the forefront of the play revolution we are witnessing.
>
> We believe that applying this technology to a broad array of characters and play patterns will create new consumer demand for JAKKS

products and will help JAKKS achieve substantial long range growth and profitability, warranting the investment in technology and content that we are making.

ddd.    The press release then offered the following upbeat guidance for 2013 (which was reiterated by Defendant Bennett on a conference call with analysts the same day):

> For 2013, the Company anticipates an increase in net sales of 4.0% to 5.0% to approximately $694 million to $700 million, with diluted earnings per share in the range of approximately $0.63 to $0.68. This guidance anticipates first-quarter 2013 net sales in the range of $70 to $73 million, with a loss per share in the range of $0.83 to $0.85, which reflects 17.6% fewer common shares outstanding primarily as a result of the July 2012 self-tender of 4.0 million shares and includes incremental operating expenses associated with the recent acquisition of Maui Toys in a seasonally low sales volume quarter, and incremental operating and marketing expenses associated with the launch of our DreamPlay product lines. This is compared to net sales of $73.4 million and a loss per share of $0.62 per diluted share in the first quarter of 2012.

eee.    During the conference call with analysts, Defendant Berman maintained a highly optimistic outlook:

> With the backdrop of a fairly challenging season for the toy industry and the global economy overall, weaker-than-expected product demand during the holidays led to a lower-than-expected results for fourth quarter and full year 2012. However, our core business remains strong. Our products in Traditional Toy segment, such as Infant/Pre-school, Seasonal, Dress-Up, and Role Play and Halloween continued to perform at retail and remained our areas of strength.
>
> The world is changing and JAKKS is changing along with it. We have experienced such excitement and receptiveness on our DreamPlay technology initiative. What we have shown on the iD image recognition and DreamPlay technologies, combined with toys and kids consumer products, has been nothing short of redefining the boundaries of the physical and digital toy play. From retail partners in the U.S. and

internationally, to our licensing partner, Disney, as well as some of the biggest toy and consumer product companies and brands in the world, there is a strong belief in the long-term adoption by children and adults of this technology.

We believe that toys and technology have to change to adapt to the way kids play today, as kids gain more and more access to smart devices. By applying the technologies to a broad array of characters and play patterns, we believe we will create a new consumer demand for our toy products. Through the DreamPlay venture, we aim to achieve substantial long-range growth and profitability, warranting the investment in this technology and content that we are making,

2013 will be a period of focused transition as we build the infrastructure for our DreamPlay venture, while also continuing to execute on our core business strategy of organic and external growth. We have added to our core business a number of new brands and licenses that we are launching this year that we feel show great promise.

We are keeping a tight rein on our operational expenses, starting with a meaningful internal restructuring. Our outlook for 2013 remains cautiously optimistic as we invest for the future and begin to rollout our plans with exciting growth opportunities in 2014 and beyond with our DreamPlay initiatives, as well as our continued focus on capitalizing on our international distribution growth opportunities.

While we recognize that it's critical for us to provide new, exciting and magical experiences for today's wired families, we will not deviate from our core business strategy to offer a diverse portfolio of evergreen products that support traditional play patterns and products that remain core to our business.

\*\*\*\*

<Bennett>: Turning to our 2013 guidance, the company anticipates an increase in net sales of 4% to 5% to approximately $694 million to $700 million with diluted earnings per share in the range of approximately $0.63 to $0.68 per diluted share.

\*\*\*\*

Despite a challenging year we had, we are optimistic in the future of JAKKS. Our diverse product portfolio is built on core, evergreen products that make up a large part of our business and remain solid

with little fluctuation. Our Toddler and baby dolls, Dress-up and Role Play, Infant/Pre-school products, such as our foot-to-floor ride-ons and activity tables, outdoor seasonal products and Disguise Halloween Costumes had terrific sales in 2012. We also had nice success with a few of our own JAKKS brands, including Power Trains. These are examples of back-to-the-basic products that resonate with consumers every year on our less per age to age compression and to the rapid changes in children's play patterns.

We are also pleased with the success of our international business in 2012, with a record full year sales. Securing license for international territories continue to be a priority. China represents a big growth opportunity, and we recently met with one of the largest Chinese retailers to expand our distribution in this territory. There's a great incremental sales potential in this region in 2014 and beyond, and we are focused on expanding licensing rights where appropriate in Asia.

Again, 2013 will be a year of transition for JAKKS. We will continue to consolidate operations to gain efficiencies and lower occupancy costs and enhance profitability in the short term with the closing of our New York office and moving our Maui division into our headquarters. We recently completed a meaningful internal restructuring, and we believe our worldwide team today has the drive, passion and creativity to move our business forward. We are optimistic that their efforts, aligned with our focused long-term strategy and investment discipline, will produce strong, creative product lines and financial results for our company. We remain focused on our brand management and growing our core business, and are looking forward to the new product launches target for extensive mass and specialty retail distribution networks.

****

The toy industry is undergoing a challenging macroeconomic environment, including the rapid growth of mobile and smart device usage amongst children that is competing with physical toys and changing how kids and parents play today. With a sharp eye on the future, our DreamPlay initiative headlines our efforts to stay ahead of the evolving play patterns by developing a segment of our product portfolio focused on physical toys that can interact with smartphones and tablets in a compelling and revolutionary way. Using iD recognition technologies, we believe DreamPlay is the answer to the new hybrid model of smart device technology and toy interactive ecosystem, where our merchandise becomes a full experience,

interacting with both consumers and other items in the toy aisle and/or at home.

fff.    When questioned by an analyst on the call about areas of weakness in 4Q 2012 with respect to licensed properties, Defendant Berman responded that the Company's core business remained solid:

> The 2 biggest components that we're - that did less than our expectations, and it was more for the U.S., Monsuno has performed terrific overseas is was — it did perform to our expectations in the U.S. The animated series which is on Nickelodeon, was not stripped and ended up being on, I think, it was a Saturday morning time slot, which wasn't very conducive for kids to watch. So the expectations we have in the U.S. weren't — they didn't achieve our high-end goal. And the same thing occurred with the Winx Club that the immediate sales in spring or the mid part of the year were terrific, but the programming changed. Those are the 2 biggest areas that we spent the most amount of media, so those 2 areas are really the components of the lower sales. All of our normal — not all. Majority of our normal, basic business is extremely solid from our foot to floor, which is the Moose area, from our Kids Only!, from our Toy division, to Disguise, to CDI, to our basic business in Power Trains, MXS, our 31-inch figures, but those are the 2 major areas that really affected us in fourth quarter. And what we realized is, what we've always said in the past is going back to the basics of the singles and doubles, which has been the core asset of our business. Keeping that in mind, we do need to adapt our business to go into the areas of where children are playing, and they are playing more and more from a younger age from 18 months, which are smart devices, and the engagement and initiative that we're doing with NantWorks and DreamPlay is the direction we're going with our core business as well. But we're not taking any big bets as we did last year by focusing on the Monsuno and/or Winx.

ggg.    On this news, the Company's shares fell $0.31 per share to close on February 21, 2013 at $12.74. The Company's shares continued to drop in the following trading session, and closed on February 22, 2013 at $12.06, a one day decline of $0.68 or over 5%, and a two day decline of $0.99 or approximately 7.5%.

hhh.   The foregoing statements were materially false and misleading for the reasons set forth above.

iii.   On March 15, 2013, JAKKS filed an annual report for the period ended December 31, 2012, on Form 10-K with the SEC, which was signed, among others, by Defendants Berman and Bennett, and reiterated the Company's previously announced financial results and financial position.   In addition, the Form 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 by Defendants Berman and Bennett, stating that the financial information contained in the Form 10-K was accurate and that it disclosed any material changes to the Company's financial reporting.   The 10-K disclosed net sales of $73.4 million for Q1 2012; $145.4 million for 2Q 2012; $314.5 million for 3Q 2012, and $133.5 million for Q4 2012. 2012 10-K at 35 & 72.   The Company reported net sales of $666.8 million for full year 2012. 2012 10-K at 53. With respect to the Traditional Toys and Electronics segment, the Company reported net sales of $363.7 million in 2012, compared to $348.9 million in 2011, representing an increase of $14.8 million, or 4.2%. Id. at 29. "The increase in net sales was primarily due to the launch of Power Train, action figures based on the animation series Monsuno®, Disney® large dolls and accessories, Winx Club® dolls and sales contribution of [the Company's] recently acquired Moose Mountain division." Id. For the Role Play, Novelty and Seasonal Toys segment, the Company reported net sales of $303.1 million in 2012, compared to $328.9 million in 2011, representing a decrease of $25.8 million, or 7.8%. Id.   "The decrease in net sales was primarily due to decreases in unit sales of role play and dress-up toys, including those based on Disney Princess® and Disney Fairies.®" Id. The Company also reported basic and diluted earnings per share in 2012 of (4.37) vs. 0.32 in 2011. 2012 10-K at 23 & 52.

jjj.   The foregoing statements were materially false and misleading for the reasons set forth above.

kkk.    On April 25, 2013, the Company issued a press release announcing financial results for the first quarter 2013 ("1Q 2013"). The Company reported that "[n]et sales for the first quarter of 2013 increased 6.4% to $78.1 million up from sales of $73.4 million reported in the comparable period in 2012." With respect to earnings, the Company reported that "net loss for the first quarter was $27.6 million, or $ 1.26 per diluted share, which included the final $0.75 million, or $0.03 per diluted share, in financial advisory fees related to the 2011 unsolicited indication of interest and reflects the non-recognition of a previously forecasted first quarter tax benefit of $5.3 million, or $0.24 per diluted share. This compares to a net loss of $16.0 million, or $0.62 per diluted share, reported in the comparable period in 2012, which includes $1.4 million, or $0.03 per diluted share, of legal and financial advisory fees and expenses related to the unsolicited indication of interest."

lll.    In the press release, Defendant Berman represented that the Company was on track to meet prior guidance:

> Our first quarter represents approximately 10% of our projected sales for the 2013 calendar year and we believe we are on track to achieve our previously announced sales and earnings forecast for the year. During the first quarter, sales of our broad array of core product lines got off to a good start and we are optimistic that they will continue to perform as projected Top contributors were centered on our evergreen, core brands including our JAKKS-owned Fly Wheels, Disney Princess dolls and dress-up, Fisher-Price ride-ons, outdoor and indoor preschool furniture, and outdoor activity items from our Maui division. While our costs were somewhat higher, including the deferral of the $5.3 million tax benefit, which is expected to be recognized in the third quarter based on our forecast, we believe that operating efficiencies and continued cost reductions for the balance of the year will also deliver the projected earnings.

///

1    mmm.    The press release then offered the following upbeat
2    guidance for 2013 (which was reiterated by Defendant Bennett on a conference call
3    with analysts the same day):

> For 2013, the Company continues to anticipate an increase in net sales
> of 4.0% to 5.0% to approximately $694 million to $700 million, with
> diluted earnings per share in the range of approximately $0.63 to $0.68,
> excluding financial advisory fees related to the 2011 indication of
> interest.

nnn.    During the conference call with analysts, Defendant Berman
continued to maintain a highly optimistic outlook:

> Sales are off to a solid start in 2013 exceeding our guidance and up
> 6.4% over last year. The early response to our broad mix of product
> line has been encouraging, and we are cautiously optimistic for the year
> ahead.  We have some really terrific products in our lineup this year
> with contributions coming from a broad range of toys and toy-related
> products and electronics for all ages and for the entire family.
>
> Our portfolio is an exciting blend of top licenses that give us leadership
> in a broad array of categories, high profile movie properties and our
> own intellectual developed brands that we believe are right on trend.
> Evolving along with our environment is vital to JAKKS Pacific's future
> prospects. And our DreamPlay initiative headlines our efforts to stay
> ahead of these continually developing play patterns. We are looking
> forward to the launch this fall of our DreamPlay Little Mermaid toys
> enhanced with iD recognition technology.
>
> We continue to focus on carrying out the cost-saving initiatives and
> company-wide restructuring plans that were put into place late last
> year. Our infrastructure is aligned with our current business levels, and
> we believe the benefits from the restructuring will be evident in our
> short and long-term financial performance.
>                                        ***
> J<Bennett>: Turning to our guidance for 2013, the company continues
> to anticipate an increase in net sales of 4% to 5% to approximately
> $694 million to $700 million, with diluted earnings per share in the
> range of approximately $0.63 to $0.68, excluding financial advisory
> fees related to the 2011 indication of interest.

\*\*\*

We will continue to execute on our core business strategy of organic and external growth while investing for the future and rolling out plans for exciting growth opportunities in 2014 and beyond.

Recent internal restructuring allowed us to consolidate operations, gain efficiencies and enhance profitability while allowing us to continue to effectively focus on our core business. We believe these efforts, combined with our focused long-term strategies and investment discipline will greatly benefit JAKKS in both the short and long term.

While the toy industry environment is more challenging than ever before, we tend to forget that there are many good positive things happening with this company. We are pursuing all avenues to grow our distribution. And we have exciting programs at retail, such as Costco and Coles this year.

ooo.    The foregoing statements were materially false and misleading for the reasons set forth above.

ppp.    On May 10, 2013, the Company filed with the SEC a quarterly report on Form 10-Q for the period ended March 31, 2013, which included signed Certifications by Defendants Berman and Bennett, stating that the financial information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's financial reporting.  The report reiterated the Company's previously announced quarterly financial results and financial position. JAKKS reported net sales of $78.1 million for the first quarter of 2013, compared to net sales of $73.4 million in the same quarter the previous year. 1Q 10-Q 2013 at 4, 7 & 23. With respect to the Traditional Toys and Electronics segment, the Company reported net sales of $38.1 million for the three months ended March 31, 2013, compared to $41.6 million for the prior year period, representing a decrease of $3.5 million, or 8.3%. Id. at 24. "The decrease in net sales was primarily due to the tapering off of sales of action figures based on the animation series Monsuno and Winx Club® dolls." Id. For the Role Play, Novelty and Seasonal Toys segment, the

Company reported net sales of $40.0 million for the three months ended March 31, 2013, compared to $31.8 million for the prior year period, representing an increase of $8.2 million, or 25.5%. Id.  "The increase in net sales was primarily due to sales contribution of [the Company's] recently acquired Maui Toys division and increases in unit sales of Halloween costumes and accessories.' Id. Earnings per share were (1.26) for the three months ended March 31, 2013 vs (0.62) for the three months ended March 31, 2012. Id. at 12.

qqq. On July 17, 2013, the Company issued a press release announcing financial results for the second quarter 2013 ("2Q 2013"). The Company reported that "[n]et sales for the second quarter of 2013 were $106.2 million compared to net sales of $145.4 million reported in the comparable period in 2012," staggering 27% decrease. With respect to earnings, the Company reported that "net loss for the second quarter was $46.9 million, or $2.14 per diluted share, which included charges for license minimum guarantee shortfalls of $14.1 million and inventory impairment of $12.2 million. This compares to net income of $0.2 million, or $0.01 per diluted share, reported in the comparable period in 2012, which included $1.7 million, or $0.5 per diluted share, of legal and financial advisory fees and expenses related to the 2011 unsolicited indication of interest."

rrr.    In the press release, Defendant Berman delivered devastating news:

> We are disappointed that JAKKS has not met its second quarter target and will not achieve its full year 2013 forecast Sales for the second quarter were significantly below expectations due to a variety of factors. Several retailers, both in the United States and in Europe, are struggling and have substantially decreased their orders. In addition, the poor performance of several of our key properties, including Monsuno and the Winx Club, also contributed to the decline, along with unusually cool weather that affected seasonal toy sales leading to more aggressive markdowns at retail as shelves are cleared for back-to-school products. We also believe the decline in sales reflects the continuing change in play patterns of children of all ages, who continue

1    to rely more and more on smart devices for their fun and entertainment
2    As previously announced, this shift in play patterns has caused
3    companies like JAKKS to evolve to meet the changing demands of its
     consumers with technologically enhanced product offerings.

4

5         sss.    The press release then disclosed that the previously provided full
6    year guidance was being slashed, the Company's dividend was being suspended and
7    announced the implementation of a major restructuring:

8         The Company currently anticipates net sales for the full year of
9         approximately $620.0 million, with revised loss per share in the range
          of approximately $56.1 million, or $2.56 per diluted share. The revised
10        guidance represents a reduction from the Company's previously
11        anticipated full year net sales of approximately $694 million to $700
          million and diluted earnings per share in the range of approximately
12        $0.63 to $0.68, excluding financial and legal advisory fees relating to
13        the 2011 unsolicited indication of interest.

14        The Company also announced that due to business conditions, it has
15        suspended its quarterly dividend, which it will re-evaluate upon a return
          to profitability.
16
17        The Company also announced a restructuring plan to commence in the
          third quarter, which will include the substantial reduction of leased
18        space, employees and other overhead expenses. Despite the projected
19        loss this year, JAKKS is anticipating a return to profitability in the year
          2014.
20
21        ttt.    The Company also announced a plan to raise $100 million in
22    capital through an offering of convertible senior notes due 2018 in a private
23    placement, with a potential $15 million in over-allotments.

24        uuu.    On a conference call with analysts the same day, Defendant
25    Bennett revealed that part of the huge second quarter loss was attributable to
26    "charges for license minimum guarantee shortfalls of $14.1 million."

27    ///

28

vvv.    On the call, analysts grilled management about the magnitude of the license minimum guarantee shortfall and the deteriorating sales:

Sean P. McGowan - Needham & Company, LLC, Research Division

Second question, this isn't the first time, by any means, that minimum license guarantees have been the source of some reduction and I'm surprised at this point that there would be the magnitude of $14 million. What does this say about the viability of those underlying licenses? I mean, this must be some pretty big properties if there is $14 million of guarantees being written off

Stephen G. Herman - Co-Founder, Chief Executive Officer, President, Secretary and Director

They come from several different licensee content — licensor content holders. Some of them were previous deals done back with previous management in specific divisions. So the deals that were done and set forth were quite rich and due to the environment and the, call it the shrinkage of retail space, the minimum guarantees were not met with the decline in sales. The other license shortfall is from a property that was no longer put on air as we had expectations that this property was being on air for quite a few years of obligation and on strip. So based off of what we see, those 2 areas of businesses, we ended up having to take the write-off of the shortfalls. But we — in addition to what you're asking, Sean, there's about a — 85% to 90% of our business is extremely constant, solid and evergreen, which goes from our Kids Only! outdoor furniture product to our foot-to-floor ride-on Moose product to our Tollytots Pre-School division to Maui to so on. What we've realized in this new environment is we need to enhance that play pattern with the, call it, iD technology, which is enhancing the, call it, physical world with the digital world, You can play with the physical world without the digital component. You can play with the digital component without the physical. But when you combine them both when a child wants to, it just is a magical experience, and we've seen it from working with Lego with our technology and they do a lot of testing. Their feedback and their focus groups was truly breathtaking. So with our core business is where we're really solid, what we realize now and what the industry is and what we've seen it, the likes and days of launching an item, and I'll use as we launched 4 years ago, our night vision goggles that did 20 million, 30 million, 40 million, 50 million in

sales and a Furby, call it, that has done, those days of the euphoric items of marketing and TV advertising and looking for these euphoric items to take off is few and far between because retailers won't bid on the inventory. There's not the top 20 retailers anymore. Where our segmentation of retail, which we're very proud of, spans throughout the mass retailers that we all know about — the Target, the Walmart, the Toys"R"Us, the Sears, but it goes to Sports Authority, Dicks Sporting Goods, Sports Chalet, Big 5, Kohl's, Spencers, Ross, Party City. So while we're diversifying the customer base, we're focusing on the basic play pattern, which is primarily we see around under 6 is where the key play pattern for children are with playing with toys. But at the same time, they're utilizing smart devices. So the enhancement of what we're doing, and we've seen it, is a magical combination.

Sean P. McGowan - Needham & Company, LLC, Research Division

I can't disagree. This actually dovetails into my final question. I can't disagree, the kids are certainly interested in these technology products. But this isn't like it happened overnight and yet your sales shortfalls go back several years and you say 80%, 90% of it is rock solid. The sales decline suggests that maybe even there's weakness there. But my question is how much confidence can you have that you're making the right bet when there's still going to be a lot of business that needs to be done in basic, traditional toys that don't have a technology element? I'm saying that other companies are not seeing their business decline as much as your business is declining. Lego couldn't be lower tech and they just keep crushing it year after year. So somebody else is doing something that you guys aren't doing to generate sales of traditional non-technical toys. So I'm not disagreeing that there needs to be some technology component to your toys, but you can't abandon the non-tech part either and you got to get that right

www. As a result of these alarming disclosures, analysts at Piper Jaffray announced that, having missed their revenue estimate by nearly 30%, confidence remained "quite low and risk to losses of key licenses continues to mount, especially if the company continues to fall short of contract minimums. PiperJaffray Company Note on JAKKS Pacific, Inc., July 17, 2013. Visibility into

1  sales or margin recovery "also remain[ed] very limited" and the analysts expected
2  "significant losses in 2013."

3      xxx. Following these earth-shattering disclosures regarding the
4  Company's poor 2Q 2013 performance, and management's response thereto,
5  JAKKS' stock dropped precipitously by approximately 39% from a close of
6  $11.48/share on July 17, 2013, to a close of $7.00/share on July 18, 2013.

7      **C.    DERIVATIVE DEMAND ALLEGATIONS**

8      68.    Plaintiff brings this action as a derivative action pursuant to Federal
9  Rules of Civil Procedure 23.1 on behalf of and for the benefit of JAKKS.

10      69.    Plaintiff will fairly and adequately represent the interests of JAKKS in
11  enforcing and prosecuting its rights, and has retained competent counsel
12  experienced in this type of litigation.

13      **D.    DEMAND IS EXCUSED FOR FUTILITY**

14      70.    Demand on the JAKKS Board to bring this action has not been made
15  and is excused because such demand would be futile. As of the filing of this
16  Complaint, JAKKS Board consists of the following six Directors: Defendants
17  Stephen G. Berman, Robert E. Glick, Michael G. Miller, Murray L. Skala, Peter
18  F. Reilly and Rex H. Poulsen.

19      71.    Of these directors, Defendant Berman is the Chief Executive
20  Officer and is not independent.

21      72.    Defendant Murray Skala is a partner in the law firm which acts as
22  the Company's General Counsel, and the Company has acknowledged that
23  Skala is not independent.

24      73.    Defendants Miller and Glick cannot be deemed independent
25  because each knowingly participated in the entrenchment scheme to entrench
26  the JAKKS Board. In addition, Glick and Miller as members of the
27  Compensation Committee engineered a sweetheart compensation deal for
28  Berman where he may be paid millions while the Company languishes in the

depths.  The net effect of this sweetheart deal is Berman gets paid millions but the Company can continue to be as unsuccessful as ever.  In addition, they authorized the unreasonable and lopsided September 2012 Joint Venture agreements to entrench themselves and the Board.  Accordingly, there is reasonable doubt that Glick and Miller could fairly evaluate a pre-suit demand.

74.  The details as to Berman's sweetheart compensation deal are as follows. Director Glick has been on the Compensation Committee for at least 10 years, and its Chairperson for the last nine years.  Miller has been a Committee member for a number of years.  Their tenure as Directors goes back to the mid-1990's, near the time that JAKK's was founded by Berman.  Glick's and Miller's actions in the Committee positions give rise to an strong inference that they are controlled and dominated by defendant Berman, as they he have repeatedly increased Berman's compensation and favorably amended his employment agreement, in the face of actions by Berman which have driven JAKKS shares to new depths.  Here they handed the failed CEO a huge contract extension despite the fact that the Company's shares are trading near an all-time low, and modified his employment contract so he can be paid huge bonuses despite the fact that the Company cannot meet EPS earnings goals.  An independent Board would have fired Berman, or at least tied his compensation to stock performance.  Rather, this Board "rewarded" Berman with an outrageous compensation package in an attempt to thwart any outside bids to acquire the Company.  Among other things:

a.  JAKKS performance under Berman has been abysmal when compared to the performance of competitors Mattel and Hasbro, as shown below:

///

1



2

3

4

5

6

7

8

9

10          b.    Despite    this,    Glick    and    Miller    extended    Berman's

11    employment contract repeatedly, so that it now runs to December 31, 2018;

12          c.    Glick and Miller have voted to repeatedly increased Berman's

13    compensation, despite the value destruction over which Berman has presided.

14    As stated in the most recent Proxy Statement dated October 28, 2013:

15          Mr. Berman's agreement as in effect on January 1, 2012

16    provided for an annual grant of $500,000 of restricted stock, the
      initial vesting of which depended *solely on EPS targets*

17    *established in the agreement*; if initial vesting occurred, then
      the restricted stock vested over time.

18

19          Pursuant to a September 2012 amendment to Mr. Berman's

20    employment agreement, commencing in 2013, his annual bonus
      has been restructured so that part of it is now capped at 300% of

21    his base salary and the performance criteria and vesting are

22    solely within the discretion of the Compensation Committee,
      which will establish all of the criteria during the first quarter of

23    each fiscal year for that year's bonus, *based upon financial and*

24    *non-financial    factors    selected* by    the    Compensation
      Committee, and another part of his annual performance bonus

25    *will be based upon the success of a joint venture entity we*

26    *initiated in September 2012.* The portion of the bonus equal to
      200% of base salary is payable in cash and the balance in

27    restricted stock vesting over three years. *In addition, the*

28    *annual grant of $500,000 of restricted stock was changed to*

1    *$3,500,000 of restricted stock and the vesting criteria was also*
2    *changed from being solely based upon established EPS*
3    *targets* to being based upon performance standards established
     by the Compensation Committee during the first quarter of each
4    year.

5         d.    Thus,  Glick  and  Miller  have  decided  that  Berman's
6    compensation will be disentangled from strict earnings per share ("EPS") targets, as
7    Berman has shown over the course of many years that he cannot meet reasonable
8    targets.

9         e.    What is worse, Glick and Miller, with minimal and confusing
10   disclosure to the public, have agreed to enrich Berman by paying him a share of the
11   cash distributions from a joint venture formed with Dr. Soon, which is the very joint
12   venture which is touted as designed to help JAKKS out of the ditch into which
13   Berman has driven it.  This is on top of a multitude of others benefits heaped on
14   Berman.  As the Proxy Statement indicates:

15        The  following  description  modifies  and  supersedes,  to  the
16        extent  inconsistent  with,  the  disclosure  in  the  preceding
         paragraphs. The term of Mr. Berman's employment agreement
17        has been extended to December 31, 2018 and provides (i) that
18        commencing on January 1, 2013 the amount of the annual
         restricted stock award *shall increase to up to $3.5M*, with the
19        vesting  of  each  annual  grant  to  be  determined  by  the
20        Compensation Committee based upon performance criteria it
         establishes during the first quarter of the year of grant; (ii)
21        commencing with 2013 Mr. Berman can earn an annual
22        performance  bonus  described  below.  Part  of  the  annual
         performance bonus in an amount not exceeding 300% of that
23        year's base salary can be earned *based upon financial and*
24        *non-financial  factors*  determined  annually  by  the
         Compensation Committee during the first quarter of each year.
25        The other part of the additional annual performance bonus can
26        be  earned  *in  an  amount  equal  to  one-half  of  the  cash*
         *distributions we receive from DreamPlay LLC,* subject to
27        satisfaction  of  the  following  three  conditions:  (1)  we  have
28        positive  net  income  after  deducting  the  aggregate  annual

performance bonus, (2) the aggregate annual performance bonus cannot exceed 2.9% of our net income for such year except that if our net income exceeds $385,000 for the year the percentage limitation shall be reduced to 1% and if our net income for the year exceeds $770,000 the percentage limitation is reduced to 0.5% and (3) we have received an aggregate of at least $15 million of net income from DreamPlay Toys LLC and DreamPlay LLC. The amendment also provides (i) that the portion of the annual performance bonus up to amount equal to 200% of that year's base salary shall be paid in cash, and any excess over 200% of such base salary shall be paid in shares of restricted stock vesting in equal quarterly installments with the initial installment vesting upon grant and the balance over three years following the award date; (ii) for a life insurance policy of $5 million or such lesser amount we can obtain for an annual premium of up to $10,000; (iii) for the reimbursement of legal fees in negotiating this amendment of up to $25,000, (iv) that the full amount of the payments and benefits payable in the event of a Change in Control (as defined in the employment agreement) shall be paid, *even if it triggers an excise tax imposed by the tax code if the net after-tax amount* would still be greater than reducing the total payments and benefits to avoid such excise tax, and (vi) the term "Good Reason Event" *has been expanded to include a change in the composition of our board of directors where the majority of the directors were not in office on September 15, 2012.*

f.      That this "wish list" of emoluments has been bestowed upon an executive whose performance has been disastrous speaks volumes as to Glick's and Miller's independence of Berman. Glick and Miller are not independent.

76.    Thus, there is no majority of the six-member Board who are disinterested; accordingly any demand upon the Board is futile. Therefore, Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful and useless act.

///

## **FIRST CLAIM FOR RELIEF**

(Against the Defendants Berman and Bennett for Contribution Pursuant to Sections 10(b) and 21D of the Exchange Act)

77.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

78.    Defendants had a duty not to defraud the investing public by the dissemination of materially false and misleading press releases and the dissemination of materially false and misleading financial statements.

79.    These Individual Defendants have been sued in the Securities Class Action alleging that these Individual Defendants caused the Company to issue materially false statements to the investing public, and, as a result, the Company and these defendants violated Section 10(b) of the Exchange Act.

80.    It is alleged in the Securities Class Action that these Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated by or in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws.  As set forth elsewhere herein in detail, these Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding JAKKS and its financial performance and prospects and/or their associations with the Company which made them privy to confidential proprietary information concerning JAKKS, were active and culpable participants in the fraudulent scheme alleged herein.  These Individual Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.  The ongoing alleged fraudulent scheme alleged in the Securities Class Actions could not have been perpetrated over a

1  substantial period of time without the knowledge and complicity of the personnel at

2  the highest level of the Company, including the Individual Defendants.

3      81.    During the Class Period alleged in the Securities Class Actions, the

4  Individual Defendants allegedly caused JAKKS to carry out a plan, scheme and

5  course of conduct which was intended to and, throughout the Relevant Period, did:

6  (i) deceive the investing public, including plaintiff and other Class members, as

7  alleged herein; (ii) artificially inflate and maintain the market price of JAKKS

8  securities; and (iii) cause the class action plaintiff and other members of the Class to

9  purchase JAKKS stock at artificially inflated prices.

10      82.    As alleged in the Securities Class Action, these defendants: (a)

11  employed devices, schemes, and artifices to defraud; (b) made untrue statements of

12  material fact and/or omitted to state material facts necessary to make the statements

13  not misleading; and (c) engaged in acts, practices and a course of business which

14  operated as a fraud and deceit upon the purchasers of the Company's securities in an

15  effort to maintain artificially high market prices for JAKKS securities in violation of

16  Section 10(b) of the Exchange Act and Rule 10b-5.  These defendants are sued as

17  primary participants in the wrongful and illegal conduct charged herein.

18      83.    It is alleged in the Class Actions that these defendants, individually and

19  in concert, directly and indirectly, by the use of the mails or other means or

20  instrumentalities of interstate commerce, engaged and participated in a continuous

21  course of conduct to conceal adverse material information about the business,

22  business practices, performance, operations and future prospects of JAKKS as

23  specified herein.  These defendants employed devices, schemes and artifices to

24  defraud, while in possession of material adverse non-public information and

25  engaged in acts, practices, and a course of conduct as alleged herein in an effort to

26  assure investors of JAKKS's value and performance and substantial growth.  This

27  included the making of, or the participation in the making of, untrue statements of

28  material facts and omitting to state material facts necessary in order to make the

1  statements made about JAKKS and its business, operations and future prospects in
2  the light of the circumstances under which they were made, not misleading, as set
3  forth more particularly herein, and engaging in transactions, practices and a course
4  of business which operated as a fraud and deceit upon the purchasers of JAKKS
5  securities during the Relevant Period.

6       84.   As alleged in the Securities Class Action, as a result of the
7  dissemination of the materially false and misleading information and failure to
8  disclose material facts, as set forth above, the market price of JAKKS's securities
9  was artificially inflated during the Relevant Period. Unaware of the fact that the
10 market price of JAKKS's shares was artificially inflated, and relying directly or
11 indirectly on the false and misleading statements made by these defendants, or upon
12 the integrity of the market in which the securities trade, and/or on the absence of
13 material adverse information that was known to or recklessly disregarded by these
14 defendants but not disclosed in public statements during the Relevant Period, and
15 Class members acquired JAKKS securities during the Relevant Period at artificially
16 high prices and were damaged thereby.

17      85.   As alleged in the Class Actions, at the time of said misrepresentations
18 and omissions, the Class members were unaware of their falsity, and believed them
19 to be true.  Had the Class members of the Class and the marketplace known of the
20 true performance, business practices, future prospects and intrinsic value of JAKKS,
21 which were not disclosed by these defendants, plaintiff and other members of the
22 Class would not have purchased or otherwise acquired their JAKKS securities
23 during the Relevant Period, or, if they had acquired such securities during the
24 Relevant Period, they would not have done so at the artificially inflated prices which
25 they paid.

26      86.   As alleged in the Securities Class Action, by virtue of the foregoing,
27 these individual defendants each violated Section 10(b) of the Exchange Act and
28 Rule 10b-5.

87.    It is further alleged in the Class Actions that the Company participated in the wrongful conduct and is equally liable for violation of Section 10(b) of the Exchange Act. Assuming that the Company is liable, these individual defendants caused the Company to violate Section 10(b) of the Exchange Act, and incur liability for damages for violation of the Securities Fraud laws.

88.    If the Company is deemed to have violated the Federal Securities Laws, and incurs damages therefore, these individual defendants are liable to the Company for contribution pursuant to sections 10(b) and 21(D) of the Exchange Act.

## SECOND CLAIM FOR RELIEF

(Derivatively and Directly Against Defendants Berman, Brodsky, Ellen, Glick, Miller, Reilly, Poulsen and Skala for Violation of Section 14 of the Exchange Act and Rule 14a-9)

89.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.  This Cause of Action is brought both derivatively and directly.

90.    Defendants had the obligation in disseminating the JAKKS Proxy Statement dated October 25, 2013, to disclosure Defendant Berman's compensation in clear, concise and understandable language, *see,* 17 CFR § 229.402.

91.    The Discussion and Analysis section of the Proxy Statement is obfuscatory, vague and confusing as it applies to Defendant Berman's compensation.   Specifically, the Proxy Statement fails to make disclosure of Defendant Berman's compensation, in clear, concise and understandable language. Rather, the discussion of how Berman will be paid, the criteria used to determine his payment and the discussion of his amended employment agreement is materially misleading.

92.    In order to understand compensation issues, and the transactions with Dr. Soon's companies, the Proxy was required to explain how these joint ventures

1  work, including specification of the preferences allotted to Dr. Soon; the financial

2  loss detriments accepted by JAKKS; the reasons for and valuation of the 5% interest

3  in DreamPlay, LLC, and the $7 million "no profit to JAKKS" repurchase right

4  related to JAKKS' $7 million investment in DreamPlay, LLC.  Only with these facts

5  in hand, can investors fully understand the nature of the September 2012 Joint

6  Ventures; the stewardship of the directors; the relationship with Dr. Soon; and the

7  factors which may affect Berman's compensation and his judgments and decisions.

8      93.    As a result of the foregoing deficiencies, Defendants have violated

9  Section 14(a) of the Exchange Act, and Rule 14a-9.

10     94.    Plaintiff seeks a declaration on behalf of JAKKS that the Proxy

11  Statement disclosure as to Defendant Berman's compensation and the September

12  2012 Joint Ventures violated the above statute and rule, and that the Directors be

13  compelled to order that a new vote be held,  and compelled to correct such errors

14  and omissions in the next Proxy Statement.

15

16                    **THIRD CLAIM FOR RELIEF**

17  (Derivatively Against Defendants Berman, Miller, Skala, Glick, Ellin, Reilly, and

18          Brodsky for Breaches of Fiduciary Duty, Including Unocal Violations)

19     95.    Plaintiff repeats and realleges all previous allegations, set forth above,

20  as if fully set forth herein.

21     96.    The Defendants, as Directors, had a duty to act with loyalty toward

22  JAKKS, and in its best interests, and with the utmost good faith.

23     97.    The Defendants had the obligation not to oppose acquisition interest in

24  the Company unless such opposition was in utmost good faith and to the benefit of

25  the Company and its shareholders.

26     98.    Further, defendants Berman, Skala, Glick, Ellin, Miller, Almagor,

27  Reilly and Brodsky permitted and caused JAKKS to enter into lopsided and unfair

28

1  transactions, i.e., the September 2012 Joint Ventures—to curry favor with Dr. Soon
2  and entrench themselves.

3      99.    For the foregoing reasons, the Defendants named in this Cause of
4  Action are liable to JAKKS for all damages suffered as a result of the violation of
5  the Unocal standard, including any harms attributable to the September 2012 Joint
6  Ventures and the permissions they have granted to exempt Dr. Soon from the Poison
7  Pill and acquire a controlling position in JAKKS without requiring Dr. Soon to help
8  sufficiently fund its cash needs.

9

10                    **FOURTH CLAIM FOR RELIEF**

11      (Against the Defendants Berman and Bennett for Breach of Fiduciary Duty as To
12              Liabilities the Company is Exposed to in the Securities Class Action)

13      100.    Plaintiff incorporates by reference and realleges each and every
14  allegation set forth above as if fully set forth herein.

15      101.    Defendants had a duty not to defraud the investing public by the
16  dissemination of materially false and misleading press releases and the
17  dissemination of materially false and misleading financial statements.

18      102.    The Defendants had a fiduciary duty to carry out the actions of JAKKS
19  in accordance with the law, including the federal securities laws, and conscious
20  failure to do so is a bad faith breach of fiduciary duty.

21      103.    In light of the above, these Defendants are liable to JAKKS for the
22  damages it has or may incur by virtue of their breaches of fiduciary duty.

23

24                    **FIFTH CLAIM FOR RELIEF**

25      (Against Defendants Almagor, Berman, Brodsky, Ellin, Glick, Miller, Reilly, Skala
26              for Breach of Fiduciary Duty Relating to Berman's Compensation)

27      104.    Plaintiff incorporates by reference and realleges each and every
28  allegation contained above, as though fully set forth herein.

105.   Defendants caused JAKKS to enter into a sweetheart compensation deal with Defendant Berman whereby Berman could be handsomely rewarded even if JAKKS is not a profitable, well-run company.

106.   Rather, Berman may be paid millions to continue his failed management even though JAKKS is unsuccessful and mired in losses.

107.   The approval of such compensation and the extension of Berman's employment contract could not have been the product of disinterested business judgment.

108.   As a result, Defendants are liable for breach of fiduciary duty.

109.   Since Berman will be compensated based on a plan which is not the product of valid business judgment, he is being unjustly enriched and must pay back such money to the Company, and his contract extension cancelled.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff demands judgment as follows:

A.   Awarding compensatory damages in favor of the Company against the Individual Defendants, for all damages sustained by the Company as a result of defendants' wrongful acts and misconduct as alleged herein;

C.   Awarding the Company prejudgment and post-judgment interest, and awarding Plaintiff and its counsel as well as their reasonable attorneys' fees, expert fees and other costs; and

///

1         D.    Awarding such other and further relief as this Court may deem just and

2    proper.

3

4    DATED: March 5, 2014           LAW OFFICES OF DAVID N. LAKE

5

6                                      By: _____

7                                         DAVID N. LAKE

8                                         Attorneys for Plaintiff

9

10   **OF COUNSEL:**
     Jeffrey C. Block, Esq.

11   Joel Fleming, Esq.
     Block & Leviton LLP

12   155 Federal Street

13   Boston, MA 02110
     (617) 398-5600

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## VERIFICATION

I, Randall Roche, am the General Counsel of the Louisiana Municipal Police Employees' Retirement System. I verify and declare that I have reviewed the Verified Shareholder Derivative Complaint in this action captioned *Louisiana Municipal Police Employees' Retirement System v. Stephan Berman, et al.* (the "Complaint"). The allegations contained within the Complaint are true and correct to the best of my knowledge, information and belief. I have also authorized the filing of this Complaint.

I declare under the penalty of perjury that the foregoing is true and correct.


Dated: February __, 2014

_____
Randall Roche, Esq.